CHEMICAL WASTE MANAGEMENT, INC., and SCA Chemical Services, Inc., Plaintiffs,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al., Defendants.

Civ. A. No. 87–2411–S.

United States District Court, D. Kansas.

Nov. 5, 1987.

Supplement to Memorandum Nov. 18, 1987.

---

J. Brian Molloy, Mary F. Edgar, Susan D. Sawtelle, Douglas H. Green, Piper & Marbury, Washington, D.C., Robert L. Driscoll, Lindsay L. Wood, Stephen J. Owens, Stinson, Mag & Fizzell, Kansas City, Mo., Roger D. Stanton, Stinson, Mage & Fizzell, Overland Park, Kan., Joan Z. Bernstein, Roger C. Zehntner, Philip L. Comella, Chemical Waste Management, Inc., Oak Brook, Ill., for plaintiffs.

Janice Miller Karlin, Asst. U.S. Atty., Kansas City, Kan., John A. Amodeo, Environmental Defense Sec., U.S. Dept. of Justice, Washington, D.C., for defendants.

### MEMORANDUM AND ORDER

SAFFELS, District Judge.

## I. INTRODUCTION

This is an action challenging certain procedures employed by defendant Environmental Protection Agency (EPA) in determining that plaintiffs are not in compliance with federal regulations concerning the processing and destruction of hazardous waste. The consequence of noncompliance in this instance renders plaintiffs' waste management facility ineligible to receive and process hazardous wastes from "Superfund" sites (*i.e.*, hazardous substances spill and waste disposal sites at which the cleanup is proceeding under E.P.A. direction pursuant to the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C.A. §§ 9601–9675 (1982 & Supp.1987)). Plaintiffs first moved for a temporary restraining order. On August 10, 1987, this court issued a brief order granting limited injunctive relief against the EPA. The order prohibited the EPA from asserting that plaintiffs' waste management facility was not in compliance with a certain EPA

guideline known as the "off-site policy,"[1] but only for the purpose of preventing the general contractor at a CERCLA site (the Martha Rose Chemical site in Holden, Missouri) from using the alleged noncompliance as a shield in barring plaintiffs from participating in the taking of bids to process hazardous wastes removed from the site. On September 16–18, 1987, the court held a hearing on plaintiffs' request for a preliminary injunction preventing the EPA from relying upon the off-site policy in rendering plaintiffs' facility ineligible to receive Superfund wastes. The court has reviewed the testimony offered by the parties, and each side has submitted extensive post-hearing memoranda. The matter is now ready for adjudication.

## II. FACTS

Plaintiff Chemical Waste Management, Inc. ("Chem Waste"), according to its brochure, is the world's largest environmental services company involved with the management of hazardous wastes. It operates twenty-six facilities in the United States, ranging from mere transportation centers to full-scale treatment, recovery, incineration and disposal plants. The facility that is the subject of the present litigation is near Chicago, Illinois (the "Chicago facility"). This facility includes one of only six incinerators in the country capable of destroying polychlorinated biphenyls ("PCBs").[2] The incinerator is operated by Chem Waste's wholly owned subsidiary, plaintiff SCA Chemical Services, Inc. The physical location of the Chicago facility had previously been used as a processing site for industrial wastes during the 1970s, and dumps still exist in the vicinity of the facility. In 1980, SCA took over operation of the facility and in 1981, the Illinois Environmental Protection Agency (IEPA) executed a compliance agreement with the Chicago Regional Port District to allow the site to be restored by SCA in contemplation of its present use. SCA restored the facility, which included adding the incinerator.

Plaintiffs' incinerating buildings sit on the eastern edge of a man-made, earthen pier that juts westward into Lake Calumet. Located on the pier itself are four separated lagoons, known as surface water impoundments. Two of the impoundments hold "scrubber water" that has been used in the incinerating process and piped to the lagoons, thereby allowing the water to settle before it is reused. A third impoundment is used for storage of storm water. The previous occupier of the pier had used the pier to store chemicals in units called "bio-beds." As part of its duties under the 1981 agreement, SCA cleaned up and covered those units. They are referred to as solid waste management units in EPA terminology. Hydrologically upgradient from SCA's facility lie several old landfills and illegal hazardous waste dump sites, none of which are owned by plaintiffs. The impoundments are therefore surrounded on three sides by lake water that has been exposed to numerous hazardous wastes over the years, and the impoundments also border the solid waste management units and other hazardous waste sources. To determine whether they are releasing any hazardous substances, wells have been installed around them for the purpose of sampling and analyzing migration.

Once the site was restored, SCA sought a permit from the federal government to operate a hazardous waste management facility. At that point in time, in the early 1980s, a company desiring to operate in the field of toxic or hazardous wastes had a multitude of federal statutes with which to contend. Among those applicable in the present case are CERCLA, the Toxic Substances Control Act (TSCA), 15 U.S.C. §§ 2601–2629 (1982), and the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. §§ 6901 et seq. (1982). RCRA and TSCA were passed by Congress within ten days of each other in October, 1976. TSCA is generally designed to cover the regulation of all chemical substances, but it con-

---

1. Discussion of this policy begins *infra* p. 1047.

2. *See Yaffe Iron & Metal Co. v. United States Envt'l Protection Agency,* 774 F.2d 1008, 1010 n. 1 (10th Cir.1985) for a good explanation of PCBs and their regulation.

tains a particularized focus on the disposal, manufacture, processing, distribution, and use of PCBs, in recognition of the seriousness of the threat that PCBs pose to the environment and human health. *See Environmental Defense Fund v. Environmental Protection Agency*, 636 F.2d 1267, 1271 (D.C.Cir.1980). It empowers the EPA to prohibit or condition the manufacture, distribution, and use of such chemicals. Stever, Law of Chemical Regulation and Hazardous Waste § 6.04, at 2–3 (1987) [hereinafter Stever]. RCRA established federal standards and requirements for solid and hazardous waste disposal, regulating all stages of hazardous waste management from generation to final disposal. Comment, *Private Response–Cost Recovery Actions Under CERCLA*, 34 Kan.L.Rev. 109, 110 & n. 10 (1985). It is the dominant hazardous waste regulatory force in the United States. Stever § 5.01, at 5–5 to –6. It is designed to accomplish three basic objectives: provide a system for tracking and preserving a record of the movement of hazardous waste from its origin to its ultimate disposal (*i.e.*, cradle to grave), ensure that disposal of hazardous waste is accomplished by environmentally safe means, and provide an enforcement mechanism to ensure compliance with the first two objectives. *Id.* at 5–7. TSCA and RCRA were generally designed to look forward in time and *prevent* contamination of the environment by regulating generators and handlers of hazardous wastes. CERCLA, passed four years later, was designed to *remedy* environmental damages caused by past improper disposal practices. It has been described as follows:

> CERCLA was designed "to bring order to the array of partly redundant, partly inadequate federal hazardous substances cleanup and compensation laws." It applies "primarily to the cleanup of leaking inactive or abandoned sites and to emergency responses to spills." ... And it distinguishes between two kinds of response: remedial actions—generally long-term or permanent containment or disposal programs—and removal efforts—typically short-term cleanup arrangements.

CERCLA authorized the federal government to respond in several ways. EPA can use Superfund resources to clean up hazardous waste sites and spills. 42 U.S.C. § 9611.... In addition, CERCLA authorizes EPA to seek an injunction in federal district court to force a responsible party to clean up any site or spill that presents an imminent and substantial danger to public health or welfare or the environment. 42 U.S.C. § 9606(a). In sum, CERCLA is not a regulatory standard-setting statute such as the Clean Air Act [or RCRA and TSCA].... Rather, the government generally undertakes pollution abatement, and polluters pay for such abatement through tax and reimbursement liability.

*New York v. Shore Realty Corp.*, 759 F.2d 1032, 1040–41 (2d Cir.1985) (citations and footnotes omitted). *See also* Stever § 6.04, at 6–40 to –41. Under CERCLA, a state or other political subdivision may enter into a contract or cooperative agreement with the EPA, upon which both entities may take action on a cost-sharing basis. *Shore Realty Corp.*, 759 F.2d at 1041 (citing 42 U.S.C. § 9604(c), (d)). If it institutes an acceptable program, a state can exercise concurrent (though not equal) authority over the regulation of hazardous waste management.

In March, 1982, the EPA acknowledged that SCA had fulfilled all the requirements for a "Part A Hazardous Waste Permit" under RCRA, also referred to as achieving "interim status." 42 U.S.C. § 6925(e). Facilities existing at the time that RCRA was passed received interim status; then, the facility could operate under interim status until such time that permanent status (*i.e.*, a "Part B Hazardous Waste Permit") was granted or denied. *Id.* §§ 6926, 6925(a)–(d). In the present case, the SCA facility is still operating under interim status, and a decision on permanent status is anticipated in the near future.

In September, 1983, the EPA determined that plaintiffs' application for thermal destruction of PCBs satisfied the required technical criteria for an incinerator under TSCA. This allowed SCA to proceed with

incineration of PCBs. The EPA warned that the approval could be withdrawn at any time if the EPA had reason to believe that operation of the incinerator presented an unreasonable risk of injury to health or the environment, although the approval has, in fact, never been withdrawn, and SCA's TSCA permit remains valid.

Therefore, as of September, 1983, the SCA incinerator was federally licensed to, and had the capability to, treat every form of hazardous waste then being handled by such facilities, from both privately administered and EPA-directed sources. Although the court will not list them in detail, the Chicago facility was then and is now subject to a multitude of regulations concerning the manner in which substances were transported to the facility, destroyed or contained, and disposed of. There are conditions under which waste destruction at the incinerator has to cease, much like the shutdown of a nuclear reactor in the event of a malfunction. The facility is subject to regular monitoring by independent examiners. By necessity, this business is heavily regulated, but the interplay of dual federal-state jurisdiction in the area, along with the complexity and sometimes redundant nature of the various federal statutes and regulations, have made the field of toxic and hazardous waste management an extremely onerous one as far as compliance is concerned.

In July, 1985, the EPA found the plaintiffs' facility to be in noncompliance with a guideline known as the "off-site policy." The off-site policy was officially titled "Procedures for Planning and Implementing Off-Site Recovery Actions," and it set forth criteria for selecting off-site RCRA land disposal facilities to receive waste generated during CERCLA removal or remedial actions. The policy was initiated in a memorandum issued by Acting EPA Assistant Administrator Jack McGraw, on May 7, 1985. The policy is not a regulation and was not subjected to promulgative procedures such as notice and comment. Rather, it is a mere internal EPA business decision. A facility not in compliance with the policy is prohibited from receiving hazardous wastes from a CERCLA site. The

purpose of the off-site policy is to prevent CERCLA-generated wastes from contributing to future environmental problems (*i.e.*, to prevent a disposal facility from itself becoming a CERCLA/Superfund site) and to minimize the potential for future federal liability. Implementation of the policy was announced in May, 1985, and it became enforceable one month later. The EPA contemplated that the policy might have to be amended after public comments were received and the regional offices had several months' experience with implementing it, although the EPA did not believe that it had any additional promulgative duty to acknowledge or remedy any criticism. Under the policy, in order to qualify for accepting CERCLA waste, the following general requirements had to be met:

(1) A facility could have no significant violations of RCRA or other applicable federal environmental laws; and

(2) There could be no other significant environmental conditions at the facility that affected the satisfactory operation of the facility.

The policy included additional requirements for CERCLA eligibility, requirements that basically incorporated RCRA and other regulations and which need not be detailed here. "Significant violations" is not defined, but apparently includes Class I violations (defined in a December 21, 1984 memorandum that has not been submitted to the court) and violations of state or federal environmental laws.

The SCA–Chicago facility is subject to the off-site policy because the facility is categorized as a land disposal facility. The definition of a land disposal facility includes landfills, land treatment, waste piles, surface impoundments, and underground injection wells, but not an incinerator itself. The Chicago facility has surface impoundments that hold the scrubber water used in the incinerating process. Other land disposal units are on the grounds surrounding plaintiffs' facility, but those existed prior to plaintiffs' initiation of operations. Since it began incinerating waste, the only waste that the facility has received has been destined for the incinerator and

thus has been destroyed. The facility has not received any waste for land disposal since plaintiffs began operating there.

Plaintiffs' incinerator has been rated by the EPA as destroying the PCB wastes that it receives to the extent of 99.9999%. In other words, after the incinerator has burned the waste, less than one part in one million of the residue consists of PCBs. This exceeds every applicable federal or state standard. Therefore, the surface impoundments that have caused the facility to come within the off-site policy receive, from the incinerator, water that contains less than one-part-in-one-million PCBs, although the evidence did not establish other wastes contained in the scrubber water. Again, the area also has within its proximity many other sources from which hazardous wastes could migrate to the surface impoundments.

The specific violation relied upon by the EPA in 1985 in finding plaintiffs' facility to have been in noncompliance with the off-site policy was groundwater contamination. Apparently, the EPA determined that the facility's surface impoundments may be leaking hazardous wastes into the groundwater, or at least that there was insufficient information to establish that a release had not occurred. This determination rendered plaintiffs' Chicago facility ineligible to receive CERCLA wastes, although the facility continued to receive and process identical kinds of hazardous wastes from non-CERCLA sites.[3] In subsequent tests, SCA concluded that no hazardous waste or hazardous waste constituents had entered the ground-water from the regulated surface impoundments, based on the following simplified explanations:

(1) Groundwater data taken prior to the incinerator's commencement in 1982 showed a higher concentration of the suspect wastes than in 1985. This indicated that the facility had not in fact released wastes into the groundwater, but rather the wastes already present in 1982 that had accumulated due to the prior misuse of the

land surrounding plaintiffs' facility accounted for the presence (and gradual subsidence) of hazardous wastes;

(2) Some of the suspect wastes found by the EPA to be present in the groundwater had a boiling point lower than the average temperature of the regulated unit; in other words, those particular wastes would be destroyed in the surface impoundments before they had the opportunity to leak into the groundwater, leading to the inescapable conclusion that the impoundments could not be the source of the contamination;

(3) Other suspect wastes alleged to have been released from the surface impoundments were also present in groundwater and water from nearby Lake Calumet. This supported the conclusion that the wastes were there before SCA began incinerating, and that the facility had not contributed to the contamination.

The IEPA analyzed the data submitted by plaintiffs and reached a similar conclusion. The IEPA specifically determined plaintiffs to be in compliance with Title 35, Subtitle G, Section 725.193 of the Illinois Administrative Code dealing with assessment requirements, and this determination was forwarded to the EPA, which disagreed both with the IEPA's own interpretation of Illinois law and with IEPA's conclusion that no release had occurred. Although the EPA had no authority to dictate Illinois' enforcement of state environmental protection laws, the EPA did assert a right to make its own independent interpretation of Illinois law and to use that interpretation in denying plaintiffs access to CERCLA waste. This was summarized in a letter from William Muno, Chief of the RCRA Enforcement Section of Region V of the EPA, to Michael Nechvatal of the IEPA:

[T]he U.S. EPA strongly recommends that the Illinois EPA require SCA to conduct quarterly determinations of rate, extent and the concentration of hazardous waste and hazardous waste constitu-

---

**3.** The EPA has never attempted to prohibit the SCA incinerator from destroying non-CERCLA

hazardous wastes.

ents until closure or issuance of a permit which addresses such constituents in the ground-water.

For your information, in discharging my responsibilities relative to U.S. EPA's CERCLA Offsite Policy, I will not recommend the use of this facility by the CERCLA program because of SCA's failure to provide the Illinois EPA with all the information required by 35 *Ill.Adm. Code* 725.193(d)(4).

Subsequently, on July 16, 1986, Muno informed SCA and the Illinois EPA that the SCA Chicago facility was in compliance with CERCLA and. RCRA, a determination based ostensibly on new data submitted in June, 1986. The EPA interpreted this data as failing to establish that conditions of the facility adversely affected or the environment. The facility thus became eligible to receive CERCLA wastes again.

The testimony at trial revealed an additional, though related reason why plaintiffs' facility was off-limits to CERCLA wastes in July, 1985, having to deal with groundwater monitoring. There are two stages of monitoring—detection monitoring and assessment monitoring. All land disposal facilities (of which the SCA Chicago facility was categorized as one) are required by RCRA regulations to have a groundwater monitoring system if they manage hazardous waste. Detection monitoring is the initial phase of testing the groundwater for contamination. Detection monitoring utilizes a statistical test to determine whether there may have been a release of hazardous wastes or constituents. The test analyzes data obtained from at least one hydrologically upgradient well and three downgradient wells. Plaintiffs' evidence showed that detection monitoring is not responsive for its intended purpose, and its extremely sensitive trigger causes most facilities to fail the test whether or not there has been a release. Upon failing detection monitoring, a facility must undergo assessment monitoring, which utilizes additional clinical analysis or perhaps more test wells, and it constitutes a generally more subjective and accurate procedure of determining groundwater contamination. Despite the fallibility of detection monitor-

ing, the EPA automatically disqualified any facility that went into assessment monitoring from receiving CERCLA wastes. In the EPA's view, being in assessment monitoring meant either that a proper assessment program had not been implemented or that a release had in fact occurred, regardless of the basis for the facility's failing to pass the detection monitoring procedure. The off-site policy therefore included, at least tacitly, the requirement that a CERCLA-eligible facility must not be in assessment monitoring. Plaintiffs' facility was in assessment monitoring in 1985. Pursuant to IEPA's direction, the facility went back into detection monitoring in mid-1986, essentially concurrent with the facility's return to eligibility.

From July, 1986 until May, 1987, SCA's Chicago facility once more received and processed hazardous wastes from CERCLA sites. During this general time period, several significant changes occurred in the method employed by EPA to determine CERCLA eligibility. One change involved the EPA's amending its application of the off-site policy in several respects. First, in July, 1986, J. Winston Porter, the Assistant Administrator for Solid Waste and Emergency Response at EPA, informed the regional administrators by memorandum that facilities in assessment monitoring should not be automatically deemed ineligible under the off-site policy. Rather, Porter advised that when a facility went into assessment monitoring, the EPA should evaluate the data that caused the facility to fail detection monitoring, and the facility should be rendered ineligible only if:

(1) there is a *probable* release to groundwater, and

(2) the release is significant in that it will affect satisfactory operation of the facility or may pose a significant threat to public health and the environment.

(emphasis in original). If the available information does not support such a determination, the facility remains eligible.

Second, in June, 1986, the EPA made a change in how it viewed releases. Under the policy as originally stated, a violation of the policy could be triggered by a signifi-

cant violation relating to groundwater contamination, regardless of the location of the release. Subsequently, the EPA realized that a release could come from a dump located near, though not a part of, an eligible facility, or else from a surface impoundment or other unit unrelated to the receiving or incinerating of CERCLA wastes. Because most incinerators in the country had associated with them surface impoundments that leaked, under the original policy virtually no facility would be eligible to receive the massive quantities of CERCLA wastes. Therefore, the EPA decided that only releases from the receiving unit (incinerator) would trigger a violation of the off-site policy (although there remained violations not related to releases that could render a facility ineligible). In the July, 1986 memorandum, Porter further clarified that the evidence must support a *probable* release to groundwater. In Porter's own words, this meant that the data must give the particular EPA region the basis for "a fairly strong presumption that there was in fact a release." William Muno of Region V contradicted both this interpretation of "probable" and the common sense meaning of the word when he testified that "probable" means that the event could have happened. The evidence strongly suggests that if Muno could not rule out the existence of a release or other violation at a facility, then the facility would be ineligible. This is a far different standard than the one set by Porter, the man with the ultimate EPA authority to set the policy. The discrepancy is significant because it was Muno who had and who exercised the actual power to render the SCA–Chicago facility ineligible.

A third significant event occurred on October 17, 1986, when Congress codified aspects of the off-site policy, as follows:

In the case of any removal or remedial action involving the transfer of any hazardous substance or pollutant or contaminant offsite, such hazardous substance or pollutant or contaminant shall only be transferred to a facility which is operating in compliance with section 3004 and 3005 of the Solid Waste Disposal Act [42 USCS §§ 6924 and 6925] (or, where applicable, in compliance with the Toxic Substances Control Act or other applicable Federal law) and all applicable State requirements. Such substance or pollutant or contaminant may be transferred to a land disposal facility only if the President determines that both of the following requirements are met:

(A) The unit to which the hazardous substance or pollutant or contaminant is transferred is not releasing any hazardous waste, or constituent thereof, into the groundwater or surface water or soil.

(B) All such releases from other units at the facility are being controlled by a corrective action program approved by the Administrator under subtitle C of the Solid Waste Disposal Act.

The President shall notify the owner or operator of such facility of determinations under this paragraph.

42 U.S.C.S. § 9621(d)(3). This provision was part of the 1986 Superfund Amendments and Reauthorization Act (SARA). Although this was considered to be a codification of the off-site policy, the EPA maintains the position that the off-site policy as originally stated and subsequently amended remains in effect, side-by-side with SARA. However, the EPA apparently views SARA as a more stringent regulation than the off-site policy. Gene Lucero, who is the National Program Official for the enforcement programs under CERCLA and RCRA and who was responsible for drafting the off-site policy and representing the EPA in discussions with Congress concerning SARA, noted the following differences between the two:

(1) SARA requires full compliance at the receiving unit before the facility is available to receive CERCLA wastes, the off-site policy permits a facility to receive CERCLA wastes as long as it has entered a compliance agreement with EPA and is making progress to remedy the violation;

(2) SARA prohibits *any* release from a receiving unit, while the old policy deals only with significant environmental problems or releases;

(3) Under SARA, a facility at which *any* release has occurred must be under a corrective plan, while the off-site policy required a plan only for significant violations;

(4) Under the off-site policy, if the EPA had received no tangible evidence of a release, the facility could remain eligible, while under SARA, the regional administrator has to make an affirmative determination on the basis of a reasonable investigation that no releases have occurred (*i.e.*, that the evidence does not establish the probability of a release).

It appears that the EPA now classifies CERCLA sites as either pre- or post-SARA. This is based on 42 U.S.C.S. § 9621 note, which provides that CERCLA section 121 (including the codification of the off-site policy, referred to herein as SARA) shall not apply to EPA records of decision [4] made prior to 30 days after enactment of the statute (October 17, 1986), November 16, 1986. Thus, if the EPA made a decision concerning a Superfund site prior to November 16, 1986, EPA applied the 1985 off-site policy standards. Decisions subsequent to November 16, 1986 would be based on SARA. The effect that this distinction has in the present case will be discussed below.

The fourth significant change concerned the manner in which the EPA informed facilities of off-site policy violations. Under the original policy, there was apparently no formal method of notifying a facility that it was no longer eligible to receive CERCLA waste, and in fact, as to plaintiffs' ineligibility from July, 1985 to July, 1986, there is some indication that plaintiffs learned of their change in status through private sources and not the EPA. The only way for someone outside the EPA to determine if a facility was in compliance was to call the EPA and ask. In a memorandum dated May 12, 1986, Mr. Porter noted that comments received concerning the off-site policy criticized the lack of notice and opportunity to respond before a final determination of ineligibility was made. Porter recognized the following competing concerns in this regard:

(1) The need to ensure that wastes are not sent to facilities that do not meet the criteria of the policy;

(2) Accommodation of notice and fairness concerns;

(3) Avoidance of interference with enforcement actions that are the basis for decisions made under the policy; and

(4) Resource limitations of EPA regional offices.

Accordingly, Porter issued the following guidelines:

(1) Regions should provide written notice to facilities of their status under the policy, particularly when that status constitutes the existence of a significant violation. Such notice effectuates the facility's ineligibility to receive CERCLA waste.

(2) The notice should provide an opportunity for the facility to respond in writing. The EPA would not consider comments relating to the application of the policy to the facts as stated. In other words, the facility could not contest the EPA's *determination that a significant violation had occurred,* but it could only object to the *consequence of the violation as alleged by the EPA.*

(3) EPA would respond only to those comments that addressed application of the policy, but not to those regarding the merits of the enforcement action.

(4) If the determination of ineligibility is based on conditions other than a significant violation, the EPA should consider and respond to comments concerning the validity of its findings unless those conditions are the subject of an enforcement action.

The only way to be heard on the merits of a determination of ineligibility when the basis is a significant violation was in the forum provided as part of an enforcement

---

**4.** A record of decision authorizes the expenditure of Superfund monies to implement a reme-

dial plan. Stever § 6.06[2][4][ii][C], at 6–82.

action.[5] In addition, Porter testified in deposition that an ineligible operator could go to the EPA for an informal conference with regional officials. If no enforcement action was in place, there was effectively no challenge to a determination of ineligibility except to make a written comment as to which the EPA did not feel obligated to respond. The EPA has continued to utilize this procedure subsequent to SARA, in great part because SARA does not mandate any specific notice and hearing procedures.[6]

With the extended outline provided above in mind, the court now turns to the events that triggered the present litigation. At some time prior to or during the summer of 1986 (possibly before the SCA facility became re-eligible to receive CERCLA wastes in July), a pipeline running between the incinerating buildings and the surface impoundments suffered a break, and some scrubber water was released (the significance of which will be explained below). The IEPA had permitted plaintiffs to go back into detection monitoring in the summer of 1986, a decision with which the EPA disagreed. Although the EPA did not have to concur with the IEPA's decision, the EPA could pursue direct federal enforcement if it believed such action was warranted. The EPA did not do this because it knew that once in detection monitoring, the SCA facility would fail and would be forced back into assessment monitoring anyway. William Muno, the chief of RCRA enforcement for Region V and the person with the actual direct authority to render the facility ineligible under CERCLA, believed that there was no way for the SCA facility to pass detection monitoring.

In March, 1987, the IEPA informed plaintiffs that they had not submitted certain information as part of an annual report due March 1, including the following:

(1) A report containing the results of the groundwater quality assessment program which includes, but is not limited to, the calculated (or measured) rate of migration of hazardous waste or waste constituents in the groundwater;

(2) The existence of an adequate groundwater assessment program.

On May 4, 1987, the EPA notified plaintiffs that because the SCA facility was in significant noncompliance with the Illinois groundwater monitoring requirements, the facility was ineligible to receive CERCLA wastes.

On June 16, 1987, the EPA issued another notification to plaintiffs, stating an additional reason for ineligibility: the presence of hazardous waste and waste constituents in the groundwater at the SCA facility. The letter referenced the pipeline break as one possible source of hazardous wastes.[7] It also referenced EPA's belief that the solid waste management units at the facility had impacted groundwater quality at the facility. The letter advised that the facility would remain ineligible "until such a time that a Consent Agreement and Final Order (CAFO) is signed to correct ground-water monitoring violations at the facility and releases at the facility are controlled by a corrective action program approved by the Administrator."

Subsequently, plaintiffs submitted the necessary documentation to correct the deficiencies found by the EPA in the March, 1987 letter. The EPA continues to maintain that the facility is ineligible to receive hazardous waste from CERCLA sites under the off-site policy based on plaintiffs' failure to comply with the June 16, 1987 letter's requirements. On this same day, June 16, 1987, J. Winston Porter informed Region V (which had made the ineligibility determination) that the SCA facility would

---

5. No enforcement action has been instituted concerning the relevant facts of this case.

6. The SPA has submitted an affidavit of Jack McGraw, in which he states that the EPA intends to permit a facility to comment and object to a violation before the facility is actually rendered ineligible. The affiant expressed the intention of distributing a memorandum to all

EPA regions concerning this change in policy, but the court is unaware of the present status or implementation of this.

7. The past release from the pipeline was remedied by July, 1986 when the EPA determined that the SCA facility was again eligible to receive CERCLA wastes.

remain eligible to receive CERCLA waste from the Bridgeport, New Jersey site despite Region V's application of the off-site policy. Porter based his decision on the fact that the March, 1987 determination of violation did not involve the incinerator unit. This turnabout theoretically reflected the pre-SARA/post-SARA distinction referenced earlier in this Memorandum and Order, as follows.

Apparently, EPA's application of the original off-site policy demonstrated a willingness to differentiate between a violating unit and a unit in compliance with the policy. Therefore, if releases or monitoring violations occurred at a surface impoundment, they would not necessarily render the entire facility ineligible. Under SARA, if any part of the facility is not in compliance with the applicable law, the facility is ineligible until the violating units are being controlled by a corrective action program. Since the sole function of the SCA facility is to receive and incinerate waste, and because the incinerator was not the violating unit, the EPA could exercise its discretion and continue to allow incineration of CERCLA wastes under the off-site policy. This is what Porter did. In fact, the SCA facility remains eligible, to this date, to receive waste from CERCLA sites at which the record of decision was made prior to November 16, 1987 (*i.e.*, pre-SARA sites). Because of EPA's continued assertion that a violation exists somewhere at the SCA facility, EPA has determined that it must prohibit the facility from receiving post-SARA CERCLA wastes.

It is important to note EPA's procedure for informing those parties seeking to dispose of CERCLA wastes of the eligibility of the SCA facility. If a party contacts the EPA and simply requests SCA–Chicago's eligibility status, the party is told that the facility is ineligible. If, however, the party specifically distinguishes between pre- and post-SARA wastes, the EPA discloses SCA–Chicago's pre-SARA eligibility. Apparently, there exists many sites at which pre-SARA hazardous wastes have yet to be removed and destroyed, so there is a substantial stake to be had in the pre-SARA hazardous waste market.

The court must add a caveat to this discussion, however, because Gene Lucero, the man in EPA whose office actually was responsible for drafting the off-site policy and helping Congress with SARA, testified that even under SARA, the EPA has begun to determine whether the significant violation is directed at the receiving unit; if not, then the facility may remain eligible. Lucero stated that this is being done to maintain consistency among pre- and post-SARA sites.

The situation discussed immediately above, along with the live testimony of the EPA officials, establishes that even in the EPA's own determination, there is no physical reason why the SCA incinerator cannot safely destroy PCBs or other hazardous wastes from CERCLA sites. The evidence was uncontroverted that the concentrations of hazardous waste constituents in the groundwater beneath the SCA incinerator today are the same as or lower than those that were there when the facility regained its eligibility status in 1986, and much lower than when the facility began operating in 1982. As discussed earlier in this Memorandum and Order, the evidence also established that William Muno, the man with the actual power to render SCA–Chicago ineligible, operated under a standard by which a facility that went into assessment monitoring or that showed any other *indication* of an off-site policy/SARA violation would be ineligible unless the existence of a release could be ruled out. This procedure forced the facility to prove a negative instead of requiring the EPA to positively establish the probability of a release, the latter standard being that established by J. Winston Porter, the man in EPA with the ultimate authority to set and enforce off-site policy. In fact, the SCA–Chicago facility is ineligible today to receive CERCLA wastes because William Muno could not rule out the possibility of a release from the solid waste management units, and not because the EPA has verified data supporting a finding that a probable release has occurred.

In the EPA's view, until plaintiffs come forward with an appropriate corrective ac-

tion program, pursuant to SARA section 121(d)(3), the facility will remain ineligible for post-SARA wastes, even though it has established only the possibility of a release and even though that possible release does not come from the receiving unit. Implementation of such a correction action plan is included in the plaintiffs' pending Part B RCRA permit. The proposed permit would require plaintiffs to conduct a RCRA facility investigation for the solid waste management units. Issuance of the permit and compliance with its requirements by plaintiffs would presumably bring them back to eligibility, although the culmination of the Part B permit process has not been reached and may not occur for months. In fact, the EPA has represented to the court that if the plaintiffs formally commit to the corrective action plan outlined in the Part B permit (which Johan Bayer of Chem Waste stated the plaintiffs have agreed to do), then even without actual approval of a Part B permit, plaintiffs' facility will be eligible to receive CERCLA wastes. Defendants thus assert that plaintiffs "hold the key to attaining eligibility."

Several factual matters remain. First, defendants contend that plaintiffs have adequate procedural protection concerning application of the off-site policy. They argue that plaintiffs can appeal the corrective action requirements of the Part B permit once the permit is issued. The second option is to go ahead and commit to the corrective action plan with the EPA. The final option is no option at all, because EPA contends that plaintiffs would have been entitled to a hearing had the EPA issued an order under 42 U.S.C. § 6928(h) dealing with corrective action, and that such an order was not issued because EPA believed plaintiffs would voluntarily negotiate a corrective action order.

Finally, there is the matter of harm that plaintiffs will suffer if an injunction does not issue. The facts have already demonstrated that there is a substantial likelihood that EPA Region V has steered business away from SCA–Chicago by informing persons making inquiry about the facility's status that it is ineligible. The record contains no indication that this practice has been discontinued. The court has no doubt that plaintiffs' status of ineligibility to receive post-SARA CERCLA wastes is financially injurious. Simply put, they have lost and are continuing to lose hazardous waste business. This is an area in which the costs of clean-up and disposal are discussed in the billions and tens of billions of dollars. New CERCLA sites are a certainty. Plaintiffs' stake in all of this is huge, since they have one of only several PCB-licensed incinerators and incineration is the preferred method of handling hazardous wastes such as these. The court recognizes that it is difficult for the plaintiffs to discover exactly how much damage has occurred because they cannot determine how many inquiries to the EPA would have led to plaintiffs' receiving a contract for waste destruction, due in part to the EPA's failure to keep a record of inquiries. Plaintiffs have presented sufficient evidence, however, concerning the O–H Materials, Fermilab, and Rose Chemical sites to establish, for the purposes of this motion for preliminary injunction, that the damage they stand to suffer is not speculative, but real and substantial.

## III. DISCUSSION

■ The first legal issue to be decided is whether this court has subject matter jurisdiction over the lawsuit. Defendants contend that in the 1986 amendments, specifically section 113(h) (42 U.S.C. § 9613(h)), Congress deprived the federal courts of jurisdiction to conduct a review of decisions such as the off-site policy. That statute reads:

No Federal court shall have jurisdiction under Federal law other than under section 1332 of title 28 of the United States Code (relating to diversity of citizenship jurisdiction) or under State law which is applicable or relevant ... to review any challenges to removal or remedial action selected under section 104 [42 U.S.C. § 9604], or to review any order issued under section 106(a) [42 U.S.C. § 9606(a)], in any action except one of the following [none of which are applicable in the present case].

The court simply believes that this statute does not apply to the present case, although the broad language of the statute appears to invite its usage. The off-site policy announced in 1985 and reprinted at 50 Fed.Reg. 45933 specifically relies upon CERCLA section 106(a), which gives EPA the authority to take action and issue orders "as may be necessary to protect public health and welfare and the environment" if the EPA determines that a potential threat exists because of an actual or threatened release of a hazardous substance from a facility. 42 U.S.C. § 9606(a). But several fundamental reasons persuade the court to retain jurisdiction over this lawsuit, despite section 113(h).

First, as a technical matter, the present ineligibility of the SCA–Chicago facility derives from SARA section 121(d)(3), 42 U.S.C. § 9621(d)(3), and not from the off-site policy. The facility is receiving wastes from sites whose records of decision are governed by the off-site policy. So in a strict sense, section 113(h) is facially inapplicable.

Second, the legislative history of section 113(h) establishes that it was designed to preclude piecemeal review and excessive delay of cleanup. This lawsuit involves quite the opposite. The policy enforced by the EPA in determining CERCLA eligibility has resulted in documented delays in effectuating the cleanup at CERCLA sites. This is thoroughly demonstrated in 18 [Current Developments] Env't Rep. (BNA) 846 (July 24, 1987), in which the author writes that "[c]leanup actions at certain superfund hazardous waste sites are being delayed for months because of disposal restrictions under the [EPA's] 'offsite policy,' according to several agency officials." The author notes that several remedial actions have had to be stopped because of a lack of disposal capacity. The source of this information is the EPA itself.

In this lawsuit, the plaintiffs do not seek any remedy that will result in a delayed cleanup, but rather seek relief that could speed up the disposal of hazardous wastes. The court has no illusions that plaintiffs are operating under some altruistic motive for the betterment of the environment, but they are certainly not attempting to hinder a removal or remedial action. Because plaintiffs are not attempting to delay a cleanup, the court believes that their legal action is expressly preserved by section 206 of the same Act that created section 113(h):

This Act does not affect or otherwise impair the rights of any person under Federal, State, or common law, except with respect to the timing of review as provided in section 113(h) [42 U.S.C. § 9613(h)]....

42 U.S.C. § 9659(h).

Last, section 113(h) implicitly contemplates that in foreclosing a lawsuit in federal court, an aggrieved party will still have an opportunity to be heard in an action following the completion of the cleanup. This situation is inapposite to the present lawsuit. The plaintiffs are not persons potentially responsible for the existence of a hazardous waste Superfund site who are attempting to seek preenforcement review of an EPA cleanup plan, a process that can delay the cleanup for months or years. It is perfectly understandable to preclude such persons from seeking judicial review of the plan until after the cleanup, when the merits of the plan and the liability of all parties can be determined in such a way as to protect innocent parties' rights. In the present case, the plaintiffs are merely seeking review of EPA decisionmaking outside the context of a particular cleanup plan, and to the extent that plaintiffs are correct in asserting that they are presently being foreclosed from receiving a substantial dollar amount of hazardous waste business because of EPA's wrongful actions, there exists no effective protection of their rights except for this lawsuit. The court will not read section 113(h) in such a way as to eliminate any opportunity for the plaintiffs to be heard.

For the foregoing reasons, defendants' motion to dismiss on jurisdictional grounds shall be denied.

■ The court will now turn to the essence of plaintiffs' requested relief. Plaintiffs ask this court to make the following generalized legal conclusions:

(1) EPA's imposition of sanctions upon mere allegation has denied plaintiffs

their rights to notice and an opportunity to be heard guaranteed by the due process clause of the Constitution;

(2) The off-site policy is a legislative rule because it is mandatory upon the EPA. Since the off-site policy was not promulgated pursuant to notice-and-comment rulemaking as required by the Administrative Procedure Act, 5 U.S.C. § 553, the policy is unlawful;

(3) The off-site policy and CERCLA section 121(d)(3) are vague and ambiguous on their face and as applied, and therefore violate the due process clause;

(4) EPA's actions in applying the off-site policy have not conformed to EPA's own regulations and have been arbitrary, capricious, and an abuse of discretion, thereby making them unlawful under the authority of 5 U.S.C. § 706.

The court must preface its decision with an expression of wariness in granting any relief that will send hazardous waste to a facility that the EPA has determined should not be receiving that waste. The courts should not be in the business of managing hazardous waste. Such decisions must be left to those persons with the expertise and experience in the area. Too much is at stake for a court to presume that it can step in and make principled decisions concerning hazardous waste when it has taken decades of time, thousands of manhours (including the greatest minds in this country), and billions of dollars to reach the point where we are just now beginning to turn the corner in the field of hazardous waste control. Congress has a system in place, and that system does not necessarily include input from this court.

Having said this, the court must conclude that the off-site policy is one of the most confusing and haphazard directives that this court has ever seen. Contradictions and inconsistencies are the rule, not the exception. The following facts prove this only too clearly:

(1) William Muno of EPA Region V applies a standard by which a facility is ineligible to receive CERCLA wastes when the evidence is insufficient to rule out the existence of a release; contrariwise, J. Winston Porter previously emphasized to the regions that a region must be able to determine that a release probably occurred before a facility became ineligible.

(2) On June 16, 1987, the plaintiffs received a letter from Region V reiterating their ineligibility, even while Region V was simultaneously receiving a letter from EPA headquarters counter-manding the ineligibility determination and directing that SCA–Chicago was eligible to receive and incinerate CERCLA waste. The upshot of this is that SCA–Chicago's eligibility to burn hazardous waste is, in the final analysis, based not upon the potential effect on the environment or the public health, but rather a technicality concerning the time period when the source of the hazardous waste came under EPA's jurisdiction.

(3) EPA's application of the off-site policy completely contradicts the express terms of CERCLA section 121(d)(3) concerning the eligibility of a facility's non-violating incinerating unit to receive and destroy hazardous waste when a separate and unrelated unit on the facility's grounds is in violation of a regulation, yet an EPA representative testified that the EPA would begin interpreting section 121(d)(3) the same as the off-site policy, in complete derogation of the statute's express language.

(4) A hazardous waste management company attempting to conduct business in the transportation and disposal of waste and efficiently manage its affairs was previously not only denied timely notification of CERCLA ineligibility, but in some instances became aware of the fact—months after the EPA's determination—from a third party. Even now, although an ineligibility determination may be based upon information that is months old, a facility is given no advance notice or any opportunity to question the determination before it is implemented (although the record contains an indication that the EPA intends to correct this).

(5) Detection monitoring, which was originally utilized by the EPA as an absolute indication of eligibility depending on whether a facility failed it, is used as a

major source of information leading to a determination of eligibility, despite uncontroverted evidence proving not only that it often produces a false result, but also that it gives no consideration to circumstances such as plaintiffs have, that is, the presence of other likely sources of groundwater contamination unrelated to the operation of the incinerator.

(6) As mentioned earlier in this Memorandum and Order, a state can have concurrent regulatory authority over hazardous waste management. Illinois in fact has an approved program. At one point in time, in March, 1986, the IEPA had determined plaintiffs' facility to be in full compliance with Illinois law and had communicated this to the EPA; yet at the same time the EPA determined the facility to be ineligible for CERCLA wastes because plaintiffs were *not* in compliance with that same Illinois law under EPA's interpretation.

(7) Although the absence of a threat to the environment was sufficient to bring the facility back into eligibility in 1986, it was not sufficient in 1987.

The court can place no blame upon the EPA for instituting a policy that eliminates potential outlets for hazardous waste even if such a policy is primarily responsible for actually halting cleanup actions. It is the EPA's job to ensure that hazardous waste disposal facilities are not themselves becoming future CERCLA sites, even though this may mean a hindrance to cleanup of existing sites. The court also cannot at this time fault EPA for acting upon a mistaken belief that a release had occurred at plaintiffs' facility when plaintiffs' voluntarily built the incinerator in a quagmire of hazardous wastes. The court does find something wrong, however, in a government agency's adopting a policy and then applying it inconsistently or rendering it so vague and ambiguous as to provide private parties no guidance on how to follow it. The court believes that this is the heart of the present dispute.

The standard for a preliminary injunction requires a moving party to establish: (1) the substantial likelihood of eventually prevailing on the merits; (2) irreparable injury absent issuance of the injunction; (3) that the injury requiring entry of an injunction outweighs whatever damage the injunction would cause the opposing party; and (4) that the injunction, if issued, would not be adverse to the public interest. *Tri–State Generation v. Shoshone River Power, Inc.*, 805 F.2d 351, 355 (10th Cir.1986).

The facts have established the existence and probable continuance of injury. Plaintiffs will not be able to recoup their losses in a subsequent damage action, because the Federal Tort Claims Act (FTCA) does not provide a remedy in the form of money damages for defects in administrative procedures. When a regulatory agency's action involves considerations of public policy and where there is room for policy judgment and decision, the agency's conduct falls within the discretionary function exception to the FTCA. 28 U.S.C. § 2680(a); *Berkovitz by Berkovitz v. United States*, 822 F.2d 1322, 1325 (3d Cir.1987). *See also id.* at 1326–27 (discussing how Congress intended to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy) (citing, among others, *United States v. S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984)). Therefore, plaintiffs' injury is irreparable.

The court also finds a substantial likelihood of plaintiffs' prevailing on the merits. At the very minimum, plaintiffs will be able to prove that the off-site policy and EPA's application of CERCLA section 121(d)(3) are vague and ambiguous. The terms used in those two directives are themselves vauge and ambiguous, but certainly their application establishes a standard that informs no one—neither private parties nor even EPA's different regions—of the conduct required to become or remain eligible to receive CERCLA wastes. "When prohibiting conduct by government regulation, the regulation must be sufficiently clear so 'that ordinary people can understand what conduct is prohibited' and so it 'does not encourage arbitrary and discriminatory enforcement.'" *Great American Houseboat Co. v. United States*, 780 F.2d 741, 746 (9th Cir.1986) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983)). A

less strict vagueness analysis is appropriate when "'the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process.'" *Great American Houseboat,* 780 F.2d at 747 (quoting *Village of Hoffman Estates v. Flip–Side Hoffman Estates, Inc.,* 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982)). Under these standards, the court believes that there is a substantial likelihood that plaintiffs will establish the EPA's application of the off-site policy and SARA as impermissibly vague and violative of due process. Pursuant to 5 U.S.C. § 706(2)(D), the court could then hold unlawful and set aside the agency's action, assuming that there exists some property or liberty right of which plaintiffs are being deprived. The court has no hesitation in finding that the RCRA and TSCA permits created a property right in receiving hazardous wastes from CERCLA sites that cannot be taken away without due process. Because the vagueness and ambiguity of the EPA's administration of the policy is so clear, the court will not address the other contentions made by plaintiffs, including the denial of notice and hearing, violation of the Administrative Procedure Act's requirements of notice-and-comment rulemaking, and EPA's arbitrary and capricious violation of its own regulations, although the court finds substantial merit in at least the latter two of these.

The court believes that the third and fourth requirements for a preliminary injunction are intimately related and must be considered in tandem. The public's interest in this matter and the potential harm to the EPA, should the injunction issue, are one and the same. If the court enjoins the EPA from rendering the SCA–Chicago facility ineligible, hazardous wastes that otherwise would be prevented from going to the facility would then be allowed to go there. The court would uncategorically refrain from entering this injunctive relief if such a consequence had any arguably potential, adverse effect upon the economy or the public health. The evidence has established exactly the converse—there are no known conditions at the SCA–Chicago facility posing a threat to human health or the

environment, and the facility is in fact receiving pre-SARA CERCLA wastes (with EPA's blessing) and non-CERCLA hazardous wastes, both of which are identical in composition to wastes taken from post-SARA CERCLA sites. It makes no sense.

Even considering all of the findings made above, however, the court simply will not at this moment issue an injunction preventing the EPA "from applying or enforcing the Off–Site Policy or CERCLA § 121(d)(3) to preclude the SCA Incinerator from incinerating hazardous wastes, hazardous substances and PCBs from CERCLA sites," as requested by plaintiffs. The potential ramifications of such an order are too great to permit a blanket injunction without first attempting an alternative dispute resolution. The court realizes that substantial financial interest are at stake, but so is the integrity of an agency that has been entrusted with the responsibility of ensuring that these United States are habitable for the next generation of Americans. The court will therefore make the following recommendations.

The court recognizes that even since the filing of this lawsuit, the EPA has begun considering clarifications of and changes in the off-site policy and SARA, as well as consolidating the application of the two in a consistent manner. The court recommends that the EPA disclose the alternatives under consideration (including proposed effective dates) and receive constructive comments from plaintiffs. A good dialogue will go far in resolving the present dispute. The court finds especially promising the comments in Jack McGraw's affidavit concerning notice and informal hearings prior to an ineligibility determination, and the status of implementation of this procedure would be particularly relevant to many issues in this lawsuit.

The court also recommends that the EPA voluntarily suspend the ineligibility of the SCA–Chicago facility for post-SARA wastes unless and until it can positively establish a probable release or other environmental condition that poses a threat to human health or the environment. The court wishes to stress that plaintiffs have

established a substantial likelihood of success on the merits and that, because of the uncontroverted evidence showing the lack of a threat to human health or the environment, the court is prepared to enter the preliminary injunction sought by plaintiffs. The court will hold a brief hearing on Monday, November 16, 1987 at 9:30 a.m. to determine whether progress toward these ends is such that the need for an injunction has been eliminated. If the court finds that the parties have not reached a satisfactory (though perhaps temporary) resolution by that date, the court will afford plaintiffs a more direct form of relief.

IT IS BY THE COURT THEREFORE ORDERED that defendants' motion to dismiss be denied. IT IS FURTHER ORDERED that plaintiffs' motion for preliminary injunction remain under advisement pending the status of this case as determined by the court after the hearing referenced above.

## SUPPLEMENT TO MEMORANDUM

On November 16, 1987, at 10:00 a.m., the court convened a status hearing concerning the progress of negotiations in this case. The hearing was conducted in open court. Plaintiffs represented that meetings between the parties had occurred and that, although some constructive conversations had taken place, plaintiffs' ultimate goal of regaining eligibility for CERCLA post-SARA wastes had not been realized.

It appears that the EPA has formally instituted the notice and hearing procedures previously set forth in an affidavit by Jack McGraw. *See* original opinion note 6. The EPA represented that these procedures became effective on Friday, November 13, 1987, and that they will be subject to rulemaking requirements of publication in the Federal Register and receiving of comments before final publication in the Code of Federal Regulations. The document released by EPA on November 13 implements not only a notice and hearing requirement, but also makes clarifications and modifications of the method by which EPA determines a facility to be in compliance with the off-site policy and SARA. The document also attempts to coordinate interpretation and application of SARA and the off-site policy. The court will not comment on this document except to say that it represents what appears to be a good faith effort to address and correct deficiencies previously discussed in the November 5 Memorandum and Order. Plaintiffs point out, however, that despite this herculean effort by the EPA, the SCA–Chicago facility remains unjustly ineligible to receive post-SARA waste.

As a further justification of the determination of ineligibility, EPA Region V officials have purportedly discovered new releases from the surface water impoundments. EPA has represented that these releases were unknown at the time of the previous hearings in this case. Plaintiffs argue that the information relied upon in determining that a release had occurred is the same information that was available in April, 1987 and upon which the SCA-facility's present ineligibility is based. In other words, plaintiffs' response to this relevation of a new release is that it is a reinterpretation of old data and is being used only to forestall the entry of an injunction. Plaintiffs contend that in any event, the purported release involves no threat to human health or the environment and that only those violations constituting such a threat should be the basis for a determination of ineligibility.

The EPA represented that this matter was close to a resolution on Friday, November 13, 1987, when the plaintiffs offered to begin a RCRA facility investigation at the SCA–Chicago facility in exchange for EPA lifting the facility's ineligible statue. The EPA now contends that plaintiffs have backed away from this proposal and intend to rely upon the RCRA Permit B procedures for instituting any facility investigation, a contradiction in that plaintiffs have previously belittled the role that the permitting process can play in resolving the present dispute.

As can be plainly seen from the preceding paragraphs, the parties came into court on Monday, November 16, 1987, still miles apart, but the potential for joint resolution was there. For that reason, the court instructed the parties to undertake one more

day of negotiation and report to judge's chambers at 9:00 a.m. on Tuesday, November 17, 1987. Shortly before the scheduled 9:00 a.m. conference, the parties informed the court that they were close to a settlement and requested additional time. The court permitted the parties to continue negotiations for another day.

The court recognizes the immediacy of the situation and the need for timely action in light of plaintiffs' alleged injuries. The court has always been prepared to institute any orders necessary to further the interests of justice in the case and has not intended by its course of conduct to withhold from plaintiffs any of their legal rights. The court does recognize the considerations mandating against interference with "an administrative agency that has developed a close understanding of the various interests," *see Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 819–21, 93 S.Ct. 2367, 2380–81, 37 L.Ed.2d 350 (1973), and the doctrine requiring compelling circumstances before a mandatory preliminary injunction can be entered. *See Citizens Concerned for Separation of Church & State v. City and County of Denver*, 628 F.2d 1289, 1299 (10th Cir.1980), *cert. denied*, 452 U.S. 963, 101 S.Ct. 3114, 69 L.Ed.2d 975 (1981). For these reasons, the court has sought to encourage the nonattorneys, who have the actual expertise in the area of hazardous wastes, to reach an agreement that will most benefit all parties concerned, including the public. Such decisions are best left in the hands of those trained to make them.

Accordingly, on the afternoon of November 18, 1987, the parties informed the court that they had breached their impasse and were prepared to make certain stipulations. Pursuant to the parties' request, the court will enter the following stipulated order:

1. Plaintiff SCA Chemical Services, Inc., shall prepare and submit to EPA within twenty (20) days from the date of this Order a schedule for submission and implementation of a work plan for a facility-wide RCRA Facility Investigation ("RFI") at the SCA incinerator facility in Chicago, Illinois. "RCRA" refers to the Resource Conservation and Recovery Act, as amended, 42 U.S. C. § 6901 *et seq.*, and "RFI" refers to an investigation to determine the nature and extent of releases, if any, of hazardous wastes and constituents from regulated units, solid waste management units, and other source areas at the SCA incinerator in Chicago, Illinois, and to gather all necessary data to support a Corrective Measures Study.

2. Plaintiffs and defendants agree to negotiate within fourteen (14) days an agreed scope of work program for the RFI, to be modeled on the draft scope of work appended to the RCRA Section 3008(h) draft order prepared by EPA Region V in this matter. Any disputes concerning the scope of work that are outstanding on the fourteenth day following the entry of this Order shall be resolved by this court. The RFI work plan to be submitted by plaintiffs on the date to be set out in the schedule must conform to the scope of work as finally agreed.

3. The parties agree to negotiate a Consent Decree in settlement of plaintiffs' request for preliminary injunctive relief, to include but not to be limited to, terms regarding RFI obligations and procedures, and a mechanism for the resolution of disputes. If agreement cannot be reached on a Consent Decree by the 45th day from the date of this Order, then the parties will so inform the court, at which time either party may petition the court for appropriate relief.

4. If the Consent Decree referenced in paragraph 3 is agreed to by the parties, then its terms concerning corrective action will be proposed as a modification to the draft RCRA Part B permit now pending for the SCA incinerator in Chicago. Such Consent Decree will remain binding and in force until the corrective action component of the RCRA Part B permit is issued and in force, at which time the permit conditions will supersede the terms of the Consent Decree.

5. The SCA incinerator in Chicago is as of this date eligible under the off-site

policy of EPA and Section 121(d)(3) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, to accept, treat, store and dispose of all CERCLA wastes.

6. The parties shall report to the court concerning the status of their settlement negotiations on or before December 1, 1987.

IT IS SO ORDERED.