Harry George WERLEIN, et al., Plaintiffs,

and

David Yepma, et al., Plaintiffs–Intervenors,

v.

The UNITED STATES of America, The United States Department of Defense, The Honorable Casper W. Weinberger, Secretary of Defense, The United States Department of the Army, The Honorable John O. Marsh, Secretary of the Department of the Army, Federal Cartridge Corporation, Honeywell, Inc., Norton Ervin Anderson, and Sylvester Bendel, Defendants.

Civ. No. 3–84–996.

United States District Court, D. Minnesota, Third Division.

Sept. 4, 1990.

John Van De North, Jr., Ann Huntrods and David McDonald of Briggs & Morgan, St. Paul, Minn., for plaintiffs.

Peter Colby and Ina Strichartz, Dept. of Justice, Washington, D.C., for U.S.

Douglas Rainbow and Nicholas Nierengarten of Harstad & Rainbow, Minneapolis, Minn., for FHI.

Scott Smith of Popham Haik Schnobrich & Kaufman, Minneapolis, Minn., for Honeywell, Inc.

Maclay Hyde and Nancy Quattlebaum of Gray Plant Mooty Mooty & Bennett, Minneapolis, Minn., for Erickson and Bendel.

## ORDER

RENNER, District Judge.

Before the Court are a host of summary judgment and dismissal motions by defendants the United States of America, *et al.* ("United States"), Federal–Hoffman, Inc. ("FHI"), Honeywell, Inc., ("Honeywell"), Norton Erickson ("Erickson") and Sylvester Bendel ("Bendel"), as well as plaintiffs' renewed motion for class certification.

This matter came on for oral hearing on March 21, 1990.

This case is a complex and long-lived action arising out of chemical discharges, primarily of trichloroethylene ("TCE"), by various tenants at the Twin Cities Army Ammunition Plant ("TCAAP") and the "Trio Solvents" site.[1] Plaintiffs are citizens who reside near the two sites, and who rely on water supplies allegedly polluted by defendants.

These motions present the Court with the unenviable task of attempting to reconcile the myriad federal and state statutes governing toxic pollution, namely: the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.*, the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq.*, the Minnesota Environmental Response and Liability Act ("MERLA"), Minn.Stat. § 115B.01 *et seq.*, and the Minnesota Environmental Rights Act ("MERA"), Minn. Stat. § 116B.01 *et seq.*

Plaintiffs also assert common law claims based on strict liability for ultrahazardous activity, nuisance, trespass, battery, and intentional and negligent infliction of emotional distress.

The claims in plaintiffs' complaint are separable into two distinct groups: those seeking injunctive relief, and those seeking monetary damages. Plaintiffs' claims for injunctive relief are brought under the above mentioned environmental statutes. Plaintiffs ask the Court to use its injunctive powers to supervise and expedite the cleanup of contaminants at the TCAAP and Trio Solvents sites.

Besides response costs under the environmental statutes, plaintiffs' damage claims are brought pursuant to the common law. Plaintiffs seek compensation for personal injuries allegedly caused by the contaminants they have ingested, as well

---

1. The United States owns TCAAP, Honeywell and FHI are tenants who have produced munitions pursuant to contracts with the United States Army. Defendants Erickson and Bendel are past owners and operators of Trio Solvents and Equipment Company. Trio Solvents was located in an industrial area called Butcher's Spur, located approximately one-half mile southwest of TCAAP.

as property damages. Plaintiffs also seek a medical monitoring fund, to be financed by defendants, that will reimburse persons exposed to contaminated water for the costs of medical screening.

The Court will address the injunctive claims first, then the damage claims, then the class certification issues, and finally an outstanding pre-trial matter.

## I. *Injunctive Relief*

1. 42 U.S.C. § 9613(h)

■ Plaintiffs seek injunctive relief pursuant to the above mentioned statutes. TCAAP defendants assert that CERCLA section 113(h), 42 U.S.C. § 9613(h), deprives this Court of subject matter jurisdiction to hear plaintiffs' injunctive claims to the extent that those claims challenge the ongoing cleanup at TCAAP.[2] Section 9613(h) states in relevant part:

> No Federal Court shall have jurisdiction under Federal law other than under section 1332 of Title 28 (relating to diversity of citizenship jurisdiction) or under state law which is applicable or relevant and appropriate under section 9621 of this title (relating to cleanup standards) to review any challenges to removal or remedial action selected under section 9604 of this title, or to review any order issued under section 9606(a) of this title, in any action except one of the following:
>
> . . . . .
>
> (4) An action under section 9659 of this title (relating to citizens suits) alleging that the removal or remedial action taken under section 9604 of this title or secured under section 9606 of this title was in violation of any requirement of this chapter. Such an action may not be brought with regard to a removal where a remedial action is to be undertaken at the site.

Defendants assert that the plain language of the statute deprives this court of jurisdiction over plaintiffs' federal and state injunctive claims. Defendants argue that because these claims in large part seek to force the parties to the FFA to speed up the cleanup at TCAAP, the claims are challenges to a remedial action within the meaning of section 9613(h).

Plaintiffs proffer two arguments in opposition. First, plaintiffs argue that section 9613(h) is facially inapplicable because it states that courts have no jurisdiction to review challenges to remedial actions selected under section 9604. Plaintiffs contend that the remedial actions at TCAAP were not selected under section 9604, but rather under section 9620. Plaintiffs point out that the FFA is entitled "Federal Facility Agreement Under Section 120."

The Court disagrees. Section 9604(a)(1) empowers the President of the United States to provide for removal or remedial action whenever there is a release of a hazardous substance. Section 9615 authorizes the President to delegate this response authority. In cases where the release occurs on private land, the President has delegated the response authority to the Administrator of the EPA. Exec. Order No 12,580 § 2(g), 3 C.F.R. 193 (1988). In cases where the release occurs on property owned by the Department of Defense, the President's response authority is delegated to the Secretary of Defense, who must exercise that authority "consistent with the requirements of [section 9620]." Exec. Order No 12,580 2(d), 3 C.F.R. 193 (1988).

Section 9620 provides a road map for application of CERCLA to federal facilities. Subsection (e)(1) orders federal owners/operators of sites where a release has occurred to consult with the EPA and formulate a remedial investigation and feasibility study ("RI/FS") not later than six months after such facility is included on the National Priorities List.

Subsection (e)(2) commands the head of the concerned department or agency to enter into an inter-agency agreement with

---

**2.** The cleanup at TCAAP is being carried out under the auspices of the Federal Facilities Agreement ("FFA"), which is an interagency agreement between the Department of the Army, the Environmental Protection Agency ("EPA") and the Minnesota Pollution Control Agency ("MPCA").

EPA.[3] The agreement must provide for expeditious remedial action at the facility in question. Physical remedial action must commence within 15 months of completion of the RI/FS. The inter-agency agreement must comply with the public participation requirements in section 9617.

Plaintiffs base their assertion that the TCAAP cleanup is proceeding under section 9620 primarily on subsections (e)(1) and (2). Plaintiffs argue that those subsections create a source of cleanup authority within CERCLA which is separate and distinct from section 9604. Defendants respond that section 9620 is primarily a procedural section which provides for EPA participation in cleanups at federal facilities and sets certain timetables.

Plaintiffs' argument is interesting. On balance, though, the Court must conclude that the authority for the TCAAP cleanup stems from section 9604. If section 9604 did not apply to federal facilities, then there would be no reason for the President to delegate response authority to the Secretary of Defense. If, as the Court believes, section 9604 applies to federal facilities, then there is no rationale for including a second CERCLA section which separately empowers remedial action.

Viewed in this light, defendants' suggestion that section 9620 dictates separate procedures for federal facility cleanups makes sense. By the very terms of Exec. Order No. 12,580 § 2(d), any cleanup at a Department of Defense facility must comply with section 9620. If section 9620 supplied a separate source of cleanup power, then theoretically the Secretary of Defense would have to state at the beginning of a cleanup "this is a section 9604 cleanup in compliance with section 9620," or "this is solely a section 9620 cleanup," or both. The Court can think of no reason why Congress would create such a scheme, since no particular consequences, other than the application of section 9613(h), would flow from the choice.

The Court holds that the TCAAP remedial action is proceeding under section 9604, subject to the requirements of section 9620. Consequently, section 9613(h) is applicable here.

Second, plaintiffs argue that section 9613(h) does not apply to injunctive claims arising under other statutes, but only to citizen suits under CERCLA itself. After considerable deliberation, the Court must now disagree.[4] The statute by its very

3. In this case, that agreement is embodied by the FFA.

4. To the extent that the Court's previous Order of September 11, 1989, is to the contrary, it is hereby superceded by this Order. The Court's previous Order resolved defendants' motion to dismiss plaintiffs' CERCLA and RCRA injunctive claims under the federal common law doctrine of primary jurisdiction. In ruling on defendants' motion, the Court approached section 9613(h) as merely the CERCLA codification of the common law doctrine of primary jurisdiction. The Court looked to primary jurisdiction case law, and compared section 9613(h) to the RCRA timing of review provision, 42 U.S.C. § 6972(b)(2)(B), which the Court also viewed as simply a codification of primary jurisdiction.

The Court dismissed plaintiffs' citizen suit claims under CERCLA based on section 9613(h). However, the Court refused to dismiss plaintiffs' injunctive challenge to the TCAAP cleanup brought under RCRA. This was largely due to the fact that RCRA has its own limitation of review provision, which only bars review of ongoing remediation which is proceeding diligently. The Court held that an issue of fact existed as to whether the TCAAP cleanup was

proceeding diligently, and refused to dismiss plaintiffs' injunctive claims under RCRA.

Implicit in this analysis was the idea that section 9613(h) did not apply to claims under RCRA. In light of the fact that the parties framed the issue as one of "primary jurisdiction," and that the Court was comparing CERCLA only to RCRA, a statute with a timing of review provision of its own which explicitly referenced the CERCLA cleanup, this is understandable. Frankly, were only CERCLA and RCRA involved, the Court probably would have let plaintiffs' RCRA injunctive claims go forward.

Now, however, defendants move for dismissal of all of plaintiffs' injunctive claims. Through these motions, defendants more properly characterize section 9613(h) as a statutory bar to subject matter jurisdiction, and not simply a codification of a common law doctrine. Faced with injunctive claims not only under RCRA, but also under the CWA and MERA, it is obvious to the Court that only two principled choices exist: (1) rule that section 9613(h) applies only to CERCLA itself, and allow plaintiffs' injunctive claims under RCRA, CWA and MERA to challenge the ongoing cleanup; or (2) rule that section 9613(h) bars all challenges to the ongoing cleanup under federal or state law.

terms states that the Court has no subject matter jurisdiction to hear "any challenges" "under Federal law ... or under state law." The fact that the statute states it applies to state law shows that Congress intended section 9613(h) to extend beyond CERCLA.

The Court has found no case law which squarely confronts the issue at hand. Nevertheless, the cases that come close support the Court's conclusion. Several courts have held that plaintiffs, both polluters and concerned citizens, may not use the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, to establish subject matter jurisdiction to challenge EPA actions taken under section 9604 or 9606. *Schalk v. Reilly*, 900 F.2d 1091, 1097 (7th Cir.1990); *Voluntary Purchasing Groups, Inc. v. Reilly*, 889 F.2d 1380, 1391 (5th Cir.1989); *Alabama v. EPA*, 871 F.2d 1548, 1560 (11th Cir.1989); *Reardon v. E.P.A.*, 731 F.Supp. 558, 565 (D.Mass.1990).

In *Schalk*, the court ruled that section 9613(h) deprived the lower court of jurisdiction to hear plaintiffs[5] claim that the APA required the EPA to perform an environmental impact study under the National Environmental Policy Act. 900 F.2d at 1097. Quoting from *Alabama v. EPA*, the court stated:

> We have already concluded that Congress intended to remove challenges to remedial action plans from the jurisdiction of the federal courts until the remedial action has been taken.

*Id.*

In *Boarhead Corp. v. Erickson*, 726 F.Supp. 607 (E.D.Pa.1989), it was ruled that section 9613(h) deprived the court of jurisdiction to hear plaintiff's claim under the National Historic Preservation Act ("NHPA"), 16 U.S.C. § 470 *et seq. Id.* at 611. Plaintiff in *Boarhead* sought to prevent the EPA from listing a site on the National Priorities List, or from conducting an RI/FS, until the EPA had complied with certain provisions of the NHPA.

The *Boarhead* court held that "[p]laintiff cannot avoid the specific statutory restrictions on jurisdiction set forth in § 9613 by claiming jurisdiction under the NHPA." *Id.* The court then added:

> Any tension that may exist between a district court's jurisdiction over claims to enforce the NHPA against an agency and the specific statutory provisions governing review of EPA actions under CERCLA I resolve in favor of Congress's obvious intent to restrict jurisdiction over review of EPA actions under CERCLA.

726 F.Supp. at 612.

The most powerful holding concerning the scope of section 9613(h) is found in *Reardon*. In that case, the court ruled that Congress intended that section 9613(h) apply even to constitutional challenges. The court found "clear and convincing evidence" that Congress intended the scope of 9613(h) to be so broad as to even cover constitutional challenges to a CERCLA cleanup. 731 F.Supp. at 568. The *Reardon* court stated: "The plain language of section 113(h) [42 U.S.C. § 9613(h)] appears unequivocal in precluding all challenges to EPA action under CERCLA." *Id.* at 567.[6] *See also Pollution Control Indus. of America v. Reilly*, 715 F.Supp. 219 (N.D.Ill.1989) (rejecting general challenge to EPA order disqualifying plaintiff as a contractor for removal activities).

The most compelling support for the holding is found in the legislative history of section 9613(h). Statements by members of both the House and Senate conference committees that drafted the Superfund Amendments and Reauthorization Act

---

After much consideration, the Court must conclude that the weight of the plain language of the statute, the case law, and the intent of Congress expressed through legislative history compel the Court to the latter conclusion. The reasons for this result are addressed *infra.*

**5.** As in this case, plaintiffs in *Schalk* included a group of concerned neighbors.

**6.** The *Reardon* court went on to hold that Congress did not possess the power to completely bar a court's jurisdiction to hear a constitutional claim, and ultimately denied plaintiffs' constitutional claim on the merits. 731 F.Supp. at 574. However, the important point for this litigation is the court's holding that Congress intended that section 9613(h) apply to constitutional claims.

("SARA"), which added section 9613(h), reflect the intent that section 9613(h) apply broadly. Senator Thurmond explained the scope of section 9613(h) as follows:

> The timing of review section is intended to be comprehensive. It covers *all lawsuits, under any authority,* concerning the response actions that are performed by the EPA.... The section also covers all issues that could be construed as a challenge to the response, and limits those challenges to the opportunities specifically set forth in the section....

132 Cong.Rec. S14929 (daily ed. Oct. 3, 1986) (emphasis added).[7]

Representative Glickman addressed the argument that judicial review of ongoing remedial actions would aid such actions:

> This is a valid argument and one which both neighbors of sites and potentially responsible parties have asserted. Neither of these persons want to see an inadequate or inappropriate remedy built. If the remedy is not adequate the neighbors may be injured and the potentially responsible parties may be liable under State law for those injuries. If the remedy has to be rebuilt, the potentially responsible parties may have to pay twice for the cleanup of one site. Notwithstanding these arguments, the conferees decided to ensure expeditious cleanups by restricting such preimplementation review.

132 Cong.Rec. H9583 (daily ed. Oct. 8, 1986).

Plaintiffs cite no case law or legislative history that would indicate that section 9613(h) applies only to CERCLA itself.[8] Plaintiffs' strongest argument is that RCRA and the CWA are separate, comprehensive statutes which give plaintiffs certain rights to injunctive relief. Congress intended that citizens have the ability to seek injunctive relief under these statutes to remedy ongoing contamination, particularly of water supplies.

By applying section 9613(h) to RCRA, CWA and MERA the Court is frustrating, to a certain extent, the purposes underlying those statutes. This is troubling, and clearly due to the fact that Congress chose to legislate in a piecemeal fashion in the environmental area. These statutes simply do not fit together neatly. Nevertheless, it is clear that Congress intended that cleanups under section 9604 go forward unchallenged until completion of a discrete phase. Allowing plaintiffs to challenge the TCAAP cleanup under RCRA, CWA and MERA would totally eviscerate section 9613(h) and the intent of Congress.

Accordingly, to the extent that plaintiffs' injunctive claims, statutory or common law, seek to challenge an ongoing remedial action under the FFA at TCAAP, those claims are dismissed without prejudice.

■ Plaintiffs also argue that the Court has jurisdiction under section 9613(h)(4) to hear challenges to a completed, separate phase of the TCAAP cleanup. The Court agrees. The Joint Conference Committee Report states:

> In new section 113(h)(4) of the substitute, the phrase "removal or remedial action taken" is not intended to preclude judi-

---

7. Representative Glickman, one of the main House spokespersons on the issue of judicial review in the conference committee, made a nearly identical statement in explaining the ramifications of section 9613(h) to House members:

> The timing review section covers all lawsuits, under any authority, concerning the response actions that are performed by the EPA....

132 Cong.Rec. H9582 (daily ed. Oct. 8, 1986).

8. Plaintiffs cite *Chemical Waste Management, Inc. v. EPA*, 673 F.Supp. 1043 (D.Kan.1987). In that case, the court declined to apply section 9613(h) because it found that the challenged EPA action derived from section 9621, which is outside the scope of section 9613(h). However,

the court also went on to state that it believed section 9613(h) was not applicable because the section was intended to prevent delay of cleanups, and plaintiff's would not delay the cleanup. *Id.* at 1055.

Plaintiffs in this case argue that the Court should hold likewise because the relief they seek will not delay the cleanup. This Court declines to follow the reasoning employed by the *Chemical Waste Management* court. Presumably, in enacting section 9613(h) Congress concluded that any challenge to a remedial action would cause delay. The language of the statute is mandatory, and the Court can think of no justification for applying the statute on a case by case basis.

cial review until the total response action is finished if the response action proceeds in distinct and separate stages. Rather an action under section 310 [42 U.S.C. § 9659] would lie following completion of each distinct and separable phase of the cleanup.

H.R.Conf.Rep. No. 962, 99th Cong., 2d Sess., *reprinted in* 1986 U.S.Code Cong. & Admin.News 2835, 3276, 3317; *see also Neighborhood Toxic Cleanup Emergency v. Reilly*, 716 F.Supp. 828, 834 (D.N.J. 1989). In fact, the Court's Order of September 11, 1989, recognized that the Court has jurisdiction to hear a challenge once a distinct phase of the cleanup is completed.

Therefore, to the extent that plaintiffs can show that they seek under section 9659 to challenge a distinct, separate phase of the cleanup which has been completed, this Court has jurisdiction to hear such a claim for injunctive relief.[9]

### 2. Medical Monitoring as Injunctive Relief

■ Plaintiffs suggest in their memorandum in support of class certification that the medical monitoring remedy they seek is available as injunctive relief under RCRA. It appears to the Court that it is not. As presently formulated, the medical monitoring fund proposed by plaintiffs simply is not an injunctive remedy. Plaintiffs propose that defendants be forced to pay a lump sum of cash into a fund, and that persons eligible for medical monitoring use that pot of cash to obtain reimbursement costs incurred as the result of medical screening examinations. Payment of cash by one party to reimburse other parties for costs incurred is not injunctive relief.

The only authority cited by plaintiffs for the proposition that the proposed fund can be considered injunctive relief is *Barth v. Firestone Tire & Rubber Co.*, 661 F.Supp. 193 (N.D.Cal.1987). In *Barth*, the court authorized a medical monitoring fund as common-law injunctive relief. However, in *Barth* the purpose of the medical monitor-

ing fund was not only to pay for medical monitoring, but also to establish an information sharing mechanism. The court stated:

> [The] fund would provide for a Medical Monitoring Program which will gather and forward to treating physicians information relating to the diagnosis and treatment of diseases which may result from the plaintiff's exposure to toxins.

661 F.Supp. at 203.

In a case where a number of persons are exposed to a toxin about which little is known, and it is necessary to gather and share information regarding diagnosis and treatment through screening, the Court would consider framing a medical monitoring and information sharing program as injunctive relief.

Such is not the case here. Plaintiffs' experts generally aver that the consequences of exposure to TCE are harmful, are known, and are capable of proof. *See* Part II–1, *infra*. It appears that the primary purpose of the medical monitoring fund proposed by plaintiffs is to screen for early signs of the numerous diseases already associated with exposure to TCE. The proposed monitoring fund contains no provisions for anything besides an exchange of money. It cannot be authorized as injunctive relief.

### 3. RCRA and CWA

The TCAAP defendants and the Trios Solvents defendants move the Court for summary judgment as to plaintiffs' claims under RCRA and CWA. It appears that all of plaintiffs' claims against TCAAP defendants under RCRA and CWA are barred at this time by 42 U.S.C. § 9613(h), as discussed above. Therefore, the Court will not address TCAAP defendants' arguments in favor of summary judgment as to plaintiffs' RCRA and CWA claims.

---

**9.** Plaintiffs raised the claim that they seek to challenge a distinct phase of the cleanup in the last round of briefs filed with the Court. Consequently, neither side has presented the Court with information or argument as to whether plaintiffs can identify a distinct, completed phase of the cleanup which they may properly challenge under section 9613(h)(4). The Court anticipates that this issue will be resolved by motion prior to trial.

■ It also appears that section 9613(h) has no effect at the Trio Solvents site. The FFA does not cover Trio Solvents. Erickson and Bendel state in a footnote of their brief that section 9613(h) bars plaintiffs' MERA claims because "plaintiffs seek to enjoin conduct being performed as part of an agency-administered remedial action...." However, section 9613(h) applies only to "removal or remedial action selected under section 104...." Erickson and Bendel have presented no evidence that any action at the Trio Solvents site has been selected under CERCLA section 104. Accordingly, Erickson and Bendel's substantive arguments in favor of summary judgment as to the RCRA and CWA claims must be addressed. Bendel and Erickson argue that the Supreme Court's decision in *Gwaltney of Smithfield v. Chesapeake Bay Foundation*, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987) mandates dismissal of plaintiffs claims under 42 U.S.C. § 6972(a)(1)(A) [RCRA] and 33 U.S.C. § 1365(a) [CWA].

■ In *Gwaltney*, the court held that a citizen suit under the CWA could not be brought based on a wholly past violation. Rather, a court only has jurisdiction under the CWA where there is an ongoing violation. 484 U.S. at 59, 108 S.Ct. at 382. To support jurisdiction, plaintiffs must make a good-faith allegation of a continuous or intermittent violation by defendants. *Id.* at 64, 108 S.Ct. at 384–85. Because of its similarity with the language of the CWA, numerous courts have applied the *Gwaltney* "ongoing" requirement to section 6972(a)(1)(A). *Ascon Properties Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1159 (9th Cir.1989); *Lutz v. Chromatex*, 718 F.Supp. 413, 424 (M.D.Pa.1989); *M.E.S.S. v. Weinberger*, 707 F.Supp. 1182, 1187 (E.D.Cal.

1988); *Coburn v. Sun Chemical*, 28 Env't. Rep.Cas. .(BNA) 1665, 1672, 1988 WL 120739 (E.D.Pa.1988).[10]

Bendel and Erickson assert that because they have neither owned nor operated their business at the Trio Solvents site since 1976, any violations at that site are by definition "wholly past." Trio defendants contend that there cannot be an "ongoing" violation at the site, and therefore conclude the Court lacks subject matter jurisdiction over plaintiffs' claims under section 6972(a)(1)(A) and section 1365(a).

While plaintiffs have provided extensive argument in their brief as to why there are ongoing RCRA violations at the TCAAP site, they have not addressed the issue of ongoing RCRA violations at the Trio Solvents site. Without argument and evidence, the Court must assume that any RCRA violations at Trio are wholly past, and not ongoing. The Court will dismiss plaintiffs' claims under section 6972(a)(1)(A).[11]

As to the CWA, however, plaintiffs do argue that there is an ongoing violation at the Trio Solvents site. Plaintiffs allege that toxic substances in the soil at the Trio Solvents site are being discharged into Long Lake and Rush Lake because rainwater that infiltrates the contaminated soil discharges into those lakes. Plaintiffs argue that these discharges constitute ongoing CWA violations within the meaning of *Gwaltney*.

■ There is a dearth of post-*Gwaltney* case law on the issue of what constitutes an ongoing violation. Erickson and Bendel argue that since the contaminants were dumped into the soil years ago, their migration into water cannot constitute an ongoing violation.[12]

**10.** The Supreme Court in *Gwaltney* also noted the similarity between the RCRA provision at issue here and the CWA provision addressed in that case. 484 U.S. at 57 n. 2, 108 S.Ct. at 381 n. 2.

**11.** The *Gwaltney* requirement of an ongoing violation has no effect on plaintiffs' claims under section 6972(a)(1)(B), because that subsection by its terms allows for suit based on wholly past violations. The *Gwaltney* court cited section 6972(a)(1)(B) as an example of a statute that

allowed for suit based on wholly past violations. 484 U.S. at 57 n. 2, 108 S.Ct. at 381 n. 2.

**12.** Erickson and Bendel also argue that there is no evidence that toxic substances from Trio Solvents have actually reached a waterway. Plaintiffs' experts aver that toxic substances from Trio Solvents are running into waterways. This is a factual issue.

The Court believes that it can. Clearly, the purpose of the Clean Water Act is to prevent the pollution of water. Where a polluter dumps toxic substances directly into a waterway, the damage is done, and that violation is "wholly past" under *Gwaltney* if plaintiffs later file suit. Here, though, there is toxic waste that has not yet reached a waterway, but is being introduced into the waterway over time. This is an "ongoing" pollution of a waterway. There are toxic substances at the Trio Solvents site that may yet be prevented from entering the water. This is consistent with the goal of the CWA, and with the reasoning of *Gwaltney*.

This holding is also consistent with the language of the CWA. The CWA prohibits discharge of pollutants into navigable waterways without a permit. 33 U.S.C. § 1311(a). The Act defines discharge of pollutant as "any *addition* of any pollutant to navigable waters from any point source...." 33 U.S.C. § 1362(12) (emphasis added). A point source is defined in CWA as:

> ... [A]ny discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged.

33 U.S.C. § 1362(14).

Several courts have viewed runoff or leaching from disposal pits as a discharge from a point source. *M.E.S.S.*, 707 F.Supp. at 1193–94; *United States v. Oxford Royal Mushroom Products*, 487 F.Supp. 852, 854 (E.D.Pa.1980). *But see Appalachian Power Co. v. Train*, 545 F.2d 1351, 1373 (4th Cir.1976) (Rain falling upon a coal pile and running into water not discharge from point source). At a minimum, there is a factual issue here as to whether the alleged discharges from Trio Solvents are from a

"point source" within the meaning of the CWA. The Court will not dismiss plaintiffs' CWA claims against Erickson and Bendel at this time.[13]

### 4. MERA

As with RCRA and CWA, it appears to the Court that plaintiffs' MERA claims against TCAAP defendants are presently barred by 42 U.S.C. § 9613(h). The Court will not address TCAAP defendants' substantive arguments in favor of summary judgment. Because section 9613(h) does not apply at Trio Solvents, the Court must address Erickson and Bendel's substantive arguments for summary judgment as to MERA.

■ MERA permits Minnesota residents to sue on behalf of the state to protect air, water, land and other natural resources located within the state from pollution, impairment, or destruction. Minn.Stat. § 116B.01. MERA empowers the Court to enjoin "any conduct which materially adversely affects or is likely to materially adversely affect the environment." Minn. Stat. §§ 116B.02, subd. 5; 116B.03, subd. 1. However, the Court may not enjoin conduct taken pursuant to any environmental quality standard, limitation, rule, order, license, stipulation agreement or permit issued by the Minnesota Pollution Control Agency ("MPCA"). Minn.Stat. § 116B.03, subd. 1.

Bendel and Erickson argue first that section 116B.03, subd. 1 bars plaintiffs' claims because remedial action at the Trio Solvents site is being conducted under the MPCA's "supervision and approval." Bendel and Erickson apparently would have the Court rule that remedial action at Trio is proceeding pursuant to a stipulation agreement under section 116B.03, subd. 1. The Court is not aware of any stipulation agreement between MPCA and Trio defendants. Rather, it appears that Trio defen-

---

**13.** Although the Court will not dismiss the CWA claims at Trio Solvents, it has certain reservations as to its power to order injunctive relief in light of the fact that neither Bendel nor Erickson operate a business or own any land at the site. To order injunctive relief, the Court will

have to order Bendel and Erickson onto someone else's property to abate the discharge of pollutants. This is contrary to normal injunctive principles. *Cf. Coburn,* 28 Env't.Rep.Cas. at 1672.

dants have done nothing to date to remedy the contamination at that site.

■ Bendel and Erickson next argue that plaintiffs cannot seek relief under MERA because that statute only allows the Court to enjoin "conduct." Bendel and Erickson submit that they are not engaged in any enjoinable conduct. Plaintiffs reply that Bendel and Erickson's failure to clean up the contamination is conduct, and that the Court can issue an injunction ordering them to remove the contaminats at Trio Solvents. Plaintiffs point out that under some circumstances, inaction may qualify as conduct.

There is no case law to guide the Court on the scope of MERA under these facts. Generally, MERA does not seem to contemplate affirmative injunctive relief that essentially amounts to an order to clean up past pollution. We are aware of no case in which a court has cited MERA as authority for such an order. In fact, if MERA were so construed, courts could use MERA to order cleanup of all pollution anywhere within the state. Under plaintiffs' definition, whoever is responsible for that pollution is engaging in conduct by not cleaning it up.

In this particular case, though, the Court believes that MERA applies. As the Court has noted in its CWA discussion, this case involves not simply past pollution, but past pollution that is allegedly causing ongoing pollution of an underground aquifer and several lakes, which are separate natural resources. Even under the view that MERA only protects the land, air and water from current or prospective harm, the statute applies, because both are present here. While MERA may not authorize the Court to order a total cleanup at the Trio Solvents site, the Court believes that MERA empowers it to order defendants to abate any continuing contamination of underground or surface waters.[14] The Court will not dismiss plaintiffs' MERA claims as they apply to Bendel and Erickson.

**14.** Again, such an injunction would be subject to the concerns expressed by the Court *supra* in note 12.

## II. *Damage Claims*

Defendants argue as a general matter that plaintiffs' claims for increased risk of disease, emotional distress, and medical monitoring are legally defective because plaintiffs have not presented any competent evidence that TCE is harmful to humans. Defendants' primary contention is that plaintiffs cannot prove these claims because the claims are not based upon statistically significant epidemiological data. Plaintiffs respond that the law does not require that proof be established solely through epidemiological data. Plaintiffs state that they posses sufficient animal, *in vitro,* and other non-epidemiological evidence to prove that TCE caused the injuries they allege.

Defendants rely on the reasoning of such cases as *In re Agent Orange Product Liability Litigation,* 611 F.Supp. 1223 (E.D.N.Y.1985), *aff'd on other grounds,* 818 F.2d 187 (2d Cir.1987) and *Brock v. Merrell Dow Pharmaceuticals, Inc.,* 874 F.2d 307 (5th Cir.), *modified* 884 F.2d 166, *rehearing denied,* 884 F.2d 167 (5th Cir.1989) for the proposition that epidemiological proof is necessary to establish legal causation.

In *Agent Orange,* Vietnam veterans and members of their families sued to recover for personal injuries allegedly caused by the defoliant Agent Orange. The case was certified as a class action, and settled. 597 F.Supp. 740 (E.D.N.Y.1984). However, several hundred class members chose to opt-out of the class prior to settlement, and to proceed with their claims. The court then granted defendants' motion for summary judgment as to those plaintiffs who opted out of the class.

The *Agent Orange* court conducted an exhaustive, thirty-four page review of the medical and scientific evidence in the case, including the depositions and affidavits of plaintiffs and their experts. 611 F.Supp. at 1230–63. The court first reviewed every significant epidemiological study to date concerning Agent Orange and Dioxin exposure. The court concluded that the epide-

miological evidence was either negative or inconclusive on the issue of whether Agent Orange could cause the serious health effects claimed by plaintiffs. *Id.* at 1231.

The court next turned to the testimony proffered by plaintiffs' experts and decided that the non-epidemiological evidence relied upon by plaintiffs experts was insufficient to establish legal causation. The court stated that the animal studies in the case were of so little probative value as to be inadmissible under Federal Rule of Evidence 403. *Id.* at 1241. It was also noted that plaintiffs' experts had failed to consider other possible causes for plaintiffs' injuries. *Id.* at 1250. The court rejected the epidemiological studies presented by plaintiffs' experts because they stemmed from industrial accidents involving exposure to much higher concentrations of dioxin than plaintiffs were exposed to. *Id.*

Based on this review, the *Agent Orange* decision concluded that the evidence of causation offered by plaintiffs' experts was inadmissible under Federal Rules of Evidence 703 and 403. Rule 703 requires that expert testimony be based on facts or data of a type reasonably relied upon by experts in the particular field in forming inferences or opinions. Rule 403 requires that evidence be excluded when its probative value is substantially outweighed by the danger of unfair prejudice. The testimony of plaintiffs' experts was insufficiently grounded in any reliable evidence, and therefore inadmissible under Rule 403. 611 F.Supp. at 1250. The *Agent Orange* court stated:

> to the extent that these experts rely on available epidemiological studies, the studies supply no basis for an inference of causation. There is simply no other reliable data on which an expert can furnish reliable testimony. Thus, no expert testimony tendered by plaintiffs would be permitted to testify under Rules 702

and 703 of the Federal Rules of Evidence.

*Id.* at 1234.

Additionally, the court ruled that the probative value of plaintiffs' evidence on causation was substantially outweighed by the danger of unfair prejudice. It stated that plaintiffs' experts could create a "false aura of scientific infallibility," not warranted because of the evidence's low probative value. 611 F.Supp. at 1256. Because the testimony of plaintiffs' experts was inadmissible, plaintiffs had no evidence of causation, and the court granted summary judgment.

In *Brock*, the court reversed the lower court's denial of defendant's motion for directed verdict or judgment notwithstanding the verdict. It did so primarily because plaintiffs had failed to produce statistically significant epidemiological evidence that Bendectin could have caused their child's birth defect.[15] The court stated:

> We find, in this case, the lack of conclusive epidemiological proof to be fatal to the Brock's case. While we do not hold that epidemiological proof is a necessary element in all toxic tort cases, it is certainly a very important element. This is especially true when the only other evidence is in the form of animal studies of questionable applicability to humans.

874 F.2d at 313. The court then conducted an in depth review of the animal and *in vitro* studies relied on by plaintiffs' experts, and declared them "quite speculative." *Id.* at 313–15.

Here, defendants ask that we follow the lead of the *Agent Orange* and *Brock* courts, and make our own, in depth review of the scientific evidence. Defendants' joint memorandum and joint reply memorandum contain extensive reviews of the various studies concerning TCE, as well as in depth scientific critiques of the evidence upon which plaintiffs' experts rely. Defendants invite the Court to make its own assessment of the expert testimony and

---

**15.** In *Richardson v. Richardson–Merrell, Inc.,* 857 F.2d 823, 831 (D.C.Cir.1988), an almost identical Bendectin case, the court also ruled that the lack of epidemiological evidence con-

necting Bendectin with birth defects justified a j.n.o.v. *See also, Lynch v. Merrell–National Laboratories,* 830 F.2d 1190 (1st Cir.1987).

rule that on the present record plaintiffs cannot prove that TCE harmed them. This we decline to do.

■ The Court believes that the better approach is the one suggested by the court in *Christopherson v. Allied–Signal Corp.*, 902 F.2d 362 (5th Cir.1990). The *Christopherson* court ruled that epidemiological proof is not the exclusive means by which a plaintiff can establish causation in a toxic tort case. The court stated:

Legal standards of proof have not yet reached the point where a toxic tort plaintiff may establish causation only through statistically significant epidemiological studies, thereby rendering unreliable expert testimony based on anything except such studies.

*Id.* at 367.

In *Christopherson*, plaintiff alleged that the cancer that killed her husband had resulted from his exposure to toxic nickel and/or cadmium fumes at his workplace. The district court ruled that the testimony of plaintiff's expert was unreliable and hence inadmissible because it was not supported by epidemiological, animal, or *in vitro* studies showing a statistically significant link between colon cancer and exposure to nickel and/or cadmium. 902 F.2d at 366. The district court also disagreed with plaintiff's expert's conclusion that the known pathogenesis of small cell carcinoma in the lungs, which had been previously associated with nickel and cadmium exposure, suggested similar small cell carcinoma elsewhere in the body. *Id.*

In reversing the district court, the *Christopherson* court pointed out that plaintiff's expert properly stated a theory of causation. First, plaintiff's expert noted that nickel and cadmium are known to be carcinogenic in humans. He then indicated that studies had linked nickel and/or cadmium exposure to lung, kidney, and prostate cancer. Plaintiff's expert provided a theory detailing how the nickel and cadmium plaintiff inhaled reached his colon, there causing genetic alterations that resulted in the cancer.

The court also observed that plaintiff's expert took into account the duration of plaintiff's exposure to the toxic substances, as well as the absence of evidence of exposure to other potential carcinogens. 902 F.2d at 367. It then stated: "These are methodologies that physicians traditionally rely on in diagnosing the cause of a particular patient's cancer." *Id.* The *Christopherson* court ruled that a court should exclude an expert opinion only if it is fundamentally unsupported and would not actually assist the jury in arriving at an intelligent and sound verdict. 902 F.2d at 365.

The Court in *Christopherson* noted the Fifth Circuit's earlier decision in *Brock*, discussed *supra*, but referred to the case as an "exception" applicable only to the drug bendectin. *Id.* The court stated the general rule that:

Courts have not required the proof or expert testimony concerning causation in toxic tort cases to be supported by epidemiological studies establishing a cause-effect relationship.

*Id.* It then stated that it would not extend the *Brock* decision. *Id.*

We believe that the approach taken by the *Christopherson* court is better suited to this case and that the law does not limit toxic tort plaintiffs solely to epidemiological proof. Plaintiffs have offered significant expert testimony detailing the adverse health effects of the toxic substances in plaintiffs' water supply.

Several of plaintiffs' experts state by affidavit that they believe that TCE is a human carcinogen. *See* Gregg aff. at 8; Lappe aff. at 16; Levin aff. at 2. All state that TCE is harmful to humans at the dosage levels ingested by plaintiffs.[16] *See*, Gregg aff. at 5; Lappe aff. at 24; Levin aff. at 2. Plaintiffs' experts base these opinions on animal studies and peer-reviewed literature. *See, e.g.*, Lappe aff. at 17–25.

■ The Court cannot hold that the basis for these opinions is so fundamentally

---

**16.** The potentially harmful effects identified by plaintiffs' experts include liver and kidney dam-

age, damage to the cardiac and immune systems, as well as an increased risk of cancer.

unreliable that the testimony by plaintiffs' experts will not actually help the jury. The issue of whether the toxic substances ingested by plaintiffs are capable of harming humans is a disputed factual issue which will be resolved by the trier of fact.

### 1. Increased Risk of Future Harm

Defendants assert that they should be awarded summary judgment as to plaintiffs' claims for increased risk of future harm. Minnesota law does not recognize a cause of action generally for increased risk of disease due to mere exposure to a toxic substance. *See State by Woyke v. Tonka Corp.*, 420 N.W.2d 624 (Minn.App.1988); *Reliance Ins. Co. v. Arneson*, 322 N.W.2d 604, 607 (Minn.1982) (no damages for threat of future harm alone). However, where a plaintiff has suffered a present physical injury that itself causes plaintiff to suffer an increased risk of physical harm in the future, plaintiff may recover damages for that increased risk of harm. *Dunshee v. Douglas*, 255 N.W.2d 42, 47 (Minn.1977), *Herbst v. Northern States Power Co.*, 432 N.W.2d 463, 466 (Minn.App. 1988) (increased risk of skin cancer due to burn).

 Here, defendants argue that plaintiffs have not alleged any present harm capable of causing cancer or other diseases in the future. The Court disagrees. Plaintiffs' experts have testified that plaintiffs who have been exposed to contaminated air and drinking water have suffered an actual physical injury in the form of chromosomal breakage, and damage to the cardiovascular and immunal systems. *See* Lappe aff. at 28; Cohen aff. at 3; Gregg aff. at 5–7. These experts also have testified that the present injuries are the cause of the alleged increased future risk of disease. *See* Gregg aff. at 7; Cohen aff. at 3; Lappe aff. at 28.

Defendants answer that the injuries identified by plaintiffs' experts are insufficient as a matter of law to support an award of damages for increased risk of future harm because they are primarily subcellular injuries. Based on the record before it, this Court cannot rule as a matter of law that plaintiffs' alleged injuries are not "real" simply because they are subcellular. The effect of volatile organic compounds on the human body is a subtle, complex matter. It is for the trier of fact, aided by expert testimony, to determine whether plaintiffs have suffered present harm. *Anderson v. W.R. Grace & Co.*, 628 F.Supp. 1219, 1226–27 (D.Mass.1986); *Brafford v. Susquehanna Corp.*, 586 F.Supp. 14, 17–18 (D.Colo. 1984).

Of course, plaintiffs at trial will bear the burden of proof on all damage issues, including present harm and the extent to which that present harm has caused an increased likelihood of future harm. Although the present case involves complicated scientific and medical issues, the damage issues from a legal standpoint turn on basic tort principles.

### 2. Medical Monitoring

 Plaintiffs assert that they are entitled to recover damages for costs of medical monitoring both as a response cost under CERCLA section 107 (42 U.S.C. § 9607), and under the common law. Courts are divided on the issue of whether plaintiffs may recover past and future costs for medical monitoring under CERCLA section 107. Cases that have allowed such claims to go forward [17] include: *Brewer v. Ravan*, 680 F.Supp. 1176 (M.D.Tenn. 1988); *Williams v. Allied Automotive Div.*, 704 F.Supp. 782 (N.D.Ohio 1988); *Lykins v. Westinghouse Elec.*, 27 Env't.Rep. Cas. (BNA) 1590, 18 Env't.L.Rep. (Env't.L. Inst.) 21,498, 1988 WL 114522 (E.D.Ky. 1988); *Jones v. Inmont Corp.*, 584 F.Supp. 1425 (S.D.Ohio 1984); *Hopkins v. Elano Corp.*, 30 Env't.Rep.Cas. (BNA) 1782 (S.D. Ohio 1989) (Magistrate Report and Recommendation).

---

**17.** The Court uses the language "allowed such claims to go forward" because in the cases cited below the courts simply refused to dismiss or grant summary judgment as to medical monitoring claims under CERCLA. The Court is not aware of any case where a court has actually awarded medical monitoring damages as a response cost under CERCLA section 107.

Cases that have dismissed or granted summary judgment as to medical monitoring claims under CERCLA section 107 include: *Lutz v. Chromatex*, 718 F.Supp. 413 (M.D.Pa.1989); *Coburn v. Sun Chemical Corp.*, 28 Env't.Rep.Cas. (BNA) 1668 (E.D. Pa.1988); *Wehner v. Syntex Corp.*, 681 F.Supp. 651 (N.D.Cal.1987); *Chaplin v. Exxon Corp.*, 25 Env't.Rep.Cas. (BNA) 2009, 1986 WL 13130 (S.D.Tex.1986).

Section 9607(a)(4)(B), the liability section of CERCLA, states:

(4) Any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—

(B) Any other necessary costs of response incurred by any other person consistent with the National Contingency Plan; ...

CERCLA does not define the phrase "necessary costs of response." The word "response" is defined as "remove, removal, remedy and remedial action." 42 U.S.C. § 9601(25). The term "remove" means the "clean up or removal of released hazardous substances ... such actions as may be necessary to monitor, assess, and evaluate the release or threat of release ... or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare ... which may otherwise result from a release or a threat of release." 42 U.S.C. § 9601(23).

Subsection 23 lists as specific examples security fencing, alternative water supplies, temporary evacuation and housing, and other emergency assistance.

The word "remedy" is defined as those "actions consistent with permanent remedy taken instead of or in addition to removal actions ... to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment." 42 U.S.C. § 9601(24).

Subsection 24 lists as specific examples containment actions, treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment.

The statutory definitions within CERCLA do not definitively answer the question of whether medical monitoring costs are "necessary costs of response." Undoubtedly, this is why courts have reached different conclusions on this issue. We must, therefore, examine the language, purposes and legislative history of section 9607, as well as the case law, in order to determine whether plaintiffs may properly recover for costs of medical monitoring.

Among the courts that have allowed medical monitoring claims to go forward, the only one that has provided substantive reasons for its decision is the *Brewer* court. That court began its analysis by noting that medical expenses incurred in the treatment of personal injuries or disease caused by an unlawful release or discharge are not recoverable under section 9607(a). 680 F.Supp. at 1179. The Court then stated:

To the extent that plaintiffs seek to recover the costs of medical testing and screening conducted *to assess the effect of the release or discharge on public health or to identify potential public health problems presented by the release,* however, they present a cognizable claim under section 9607(a).

*Id.* (emphasis in original).

The *Brewer* court reasoned that such tests were "removal" actions within the definition of section 9601(23), and therefore constituted necessary costs of response. *Id.*

The other courts that have allowed medical monitoring claims to go forward have done so primarily without discussion. In *Williams*, the court simply cited to *Brewer*. 704 F.Supp. at 784. The *Inmont* court stated that it would not dismiss claims for medical testing in part because CERCLA's definitions of removal and remedial actions are broadly drawn. 584 F.Supp. at 1430.

In *Lykins* the court simply stated that medical testing costs were recoverable as long as they were incurred as part of a "cleanup." 27 Env't.Rep.Cas. at 1594. The *Hopkins* court stated in *dicta* that hazardous substances do not cease to be a public health concern merely because they come to rest in a particular person's body. 30 Env't.Rep.Cas. at 1786.

The leading case for the proposition that costs for future medical monitoring are not necessary costs of response is *Coburn*. There, the court began by noting that the statutory definitions in CERCLA contain no reference to medical expenses or inference that they are response costs. 28 Env't.Rep.Cas. at 1670. Rather, the definitions "clearly contemplate only the cleanup of toxic substances from the environment." *Id.*

Next, the court pointed out that CERCLA does contain medical care provisions, and that these provisions are separate from the liability provisions of section 107. *Id.* As part of the 1986 SARA amendments, Congress created the Agency for Toxic Substances and Disease Registry ("ATSDR") in Section 104(i) of CERCLA to provide medical care and testing to exposed individuals including "tissue sampling chromosomal testing, epidemiological studies, or any other assistance appropriate under the circumstances." 42 U.S.C. § 9604(i)(1)(D). From this, *Coburn* reasoned that "when Congress wanted to provide for medical care and testing, it knew how to do so in explicit language." 28 Env't.Rep.Cas. at 1670.

Finally, the court looked to CERCLA's legislative history. It then stated that the original Senate Superfund Bill contemplated recovery for medical monitoring costs. The court quoted Senator Randolph, who announced that "[we] have deleted the federal cause of action for medical expenses or property or income loss." *Id.*

The *Coburn* court concluded that the plain language of the statute, the fact that CERCLA contains a separate medical testing provision, and the legislative history demonstrate that medical monitoring is not "removal" within the meaning of section

107. The court specifically rejected *Brewer's* holding that medical monitoring was removal, and dismissed plaintiffs' claims for medical screening and/or future medical monitoring. 28 Env't.Rep.Cas. at 1671.

The other courts that have denied medical monitoring claims have also relied on the statutory language and legislative history. *See Chaplin*, 25 Env't.Rep.Cas. at 2012; *Wehner*, 681 F.Supp. at 653; *Lutz*, 718 F.Supp. at 418 (court adopts *Coburn* rationale as its own).

On balance, the Court finds the cases denying medical monitoring claims under CERCLA persuasive. The most common statement by the courts that allowed such claims to go forward was that it was too early in the lawsuit to consider dismissing the claims. *See Jones* 584 F.Supp. at 1429–30; *Williams* 704 F.Supp. at 784; *Lykins* 27 Env't.Rep.Cas. at 1594. The *Brewer* court, the only one to address the issue head-on, adopts an interpretation of the phrase "monitor, assess and evaluate the release" that is not supported by the language or history of the statute.

This Court finds particularly persuasive the fact that as part of the SARA amendments, Congress created the Agency for Toxic Substances and Disease Registry. 42 U.S.C. § 9604(i)(1). Section 9604(i)(1)(D), (E) empowers the ATSDR to:

> in cases of public health emergencies caused or believed to be caused by exposure to toxic substances, provide medical care and testing to exposed individuals, including but not limited to tissue sampling, chromosomal testing where appropriate, epidemiological studies, or any other assistance appropriate under the circumstances; and

> either independently or as part of other health status survey, conduct periodic survey and screening programs to determine relationships between exposure to toxic substances and illness. In cases of public health emergencies, exposed persons shall be eligible for admission to hospitals and other facilities and services operated or provided by the Public Health Service.

Clearly, Congress was not ignorant of the potential need for medical testing arising out of a release of toxic substances. It chose to delete the medical provisions from section 9607, and to address testing concerns via section 9604(i). This Court's power and jurisdiction are limited by the terms of Congressional statutes. Here, the Court cannot locate any authority in section 9607 to allow as a response cost the type of medical monitoring that plaintiffs seek.

Even if we were to follow the rationale of *Brewer*, we would still reach the same result. *Brewer* stressed the fact that it would not allow "medical expenses *incurred in the treatment of personal injuries or disease*," but would allow "the cost of medical testing and screening conducted *to assess the effect of the release or discharge on public health or to identify potential public health problems*." 680 F.Supp. at 1179 (emphasis in original). In fact, the *Brewer* court went on to state that "it is unclear whether the medical tests and screening allegedly conducted by plaintiffs were public health related...." *Id.*[18]

Here, the relief plaintiffs seek is primarily personal treatment for disease. Plaintiffs argue that their exposure to TCE and other harmful chemicals has created an increased risk of cancer for which they can recover damages in tort.[19] If this is so, then monitoring for early signs of cancer or other disease is essentially treatment for the injury that plaintiffs have suffered. This is vividly demonstrated by plaintiffs' admission that not all persons who have ingested TCE would need medical monitoring. Plaintiffs state that monitoring would depend upon the recommendation of the individual's personal physician. No assess-

ment of the release is involved in such treatment.

Plaintiffs argue that future monitoring will "mitigate damage to the public health" within the meaning of section 9601(23). Plaintiffs state that their health is synonymous with the public health.

It is true that medical monitoring could mitigate the adverse public health effects of the TCAAP release. However, it is equally true that removing a cancerous tumor from a TCAAP victim would also mitigate the adverse public health effects in the same manner. Examining that tumor prior to surgery would certainly be an "assessment" of the effect of TCE on the victim. Yet it is clear that the mitigation and assessment described above are medical procedures for the treatment of injury, the costs of which are not recoverable as response costs under section 9607.

For the above stated reasons, the Court will dismiss plaintiffs' claim to recover damages for medical monitoring under section 9607.

■ Plaintiffs argue in the alternative that they are entitled to recover the costs of future medical monitoring as tort damages under the common law. The Court agrees. Assuming that a given plaintiff can prove that he has present injuries that increases his risk of future harm, medically appropriate monitoring is simply a future medical cost, which is certainly recoverable. *Hagerty v. L & L Marine Services, Inc.*, 788 F.2d 315, 319 (5th Cir.1986). There is ample authority for the proposition that upon proper proof, injured plaintiffs may recover damages for medical monitoring. *Merry v. Westinghouse Elec. Corp.*, 684 F.Supp. 847, 849–52 (M.D.Pa.1988); *Ayers*

---

18. The Court does not hold that costs for medical tests could never properly fall within the CERCLA definition of response costs. For example, it is possible to conceive of a circumstance where medical tests would be necessary to determine how far a particular contaminant had spread. In this situation, medical tests would be necessary to effectuate the removal of the hazardous substances from the environment.

19. Arguing that they have suffered present harm for purposes of their increased risk of cancer claim, plaintiffs state:

In the present case, plaintiffs are not seeking damages for cancer and other TCE related health problems that they will develop in the future. Instead, they are asking for damages for the increased risk of future disease. Increased risk is a condition that presently exists....

Plaintiffs' memorandum in opposition at p. 20 n. 9.

v. *Jackson Township*, 106 N.J. 557, 525 A.2d 287, 312 (1987).

Defendants' primary contention is that the Court should dismiss the common law medical monitoring claim because plaintiffs have no legally sufficient proof that the toxic substances they ingested are capable of harming humans. Essentially, defendants argue that there is nothing to monitor.

This argument is unavailing in light of the Court's prior ruling regarding the harmfulness of TCE and the other substances to which plaintiffs have been exposed as well as the factual issues involved.

### 3. Emotional Distress

 Defendants move the Court to grant summary judgment as to plaintiffs claims for damages for emotional distress and fear caused by the allegedly increased risk of future disease with which they now live.

To recover damages for a negligent infliction of emotional distress under Minnesota law, a plaintiff must (1) suffer a contemporaneous physical injury; or (2) have been in some personal physical danger caused by the defendant's negligence and manifest physical symptoms of the distress; or (3) have been subject to an underlying tort involving a direct invasion of the plaintiff's rights, such as defamation or malicious prosecution. *Langeland v. Farmers State Bank of Trimont*, 319 N.W.2d 26, 31 (Minn.1982).

Additionally, even if severe emotional distress exists, the defendant may escape liability for his conduct if the distress is exaggerated in comparison to that which a reasonable person would experience under the circumstances. *Cafferty v. Garcia's of Scottsdale, Inc.*, 375 N.W.2d 850, 854 (Minn.App.1985).

A plaintiff may also recover damages for an intentional infliction of emotional distress if four elements are present: (1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress; and (4) the distress must be severe. *Hub-*

*bard v. United Press Int'l*, 330 N.W.2d 428, 438–39 (Minn.1983).

Defendants contend that plaintiffs cannot satisfy any of the above tests. First, defendants assert that plaintiffs cannot meet the personal injury or physical danger requirements because they lack proof that TCE is capable of harming them or has harmed them. Defendants claim that even accepting plaintiffs claims of subcellular harm, this type of harm is insufficient to satisfy the physical injury requirement for recovery of emotional distress damages. Defendants further argue that even if plaintiffs have demonstrated symptoms of emotional distress or fear, these fears are unreasonable in light of the lack of scientific proof that TCE is harmful.

Defendants further claim that plaintiffs cannot recover under the physical danger rationale because plaintiffs have not provided sufficient evidence that they exhibit physical manifestations of the alleged emotional distress. Defendants liken this case to *State by Woyke v. Tonka Corp.*, 420 N.W.2d 624 (Minn.App.1988). That case also involved plaintiffs seeking emotional distress damages based on exposure to TCE.

In *Woyke*, plaintiffs sought to recover for negligent infliction of emotional distress under the physical danger or "zone of danger" rationale. At the end of plaintiffs' evidence, the trial court dismissed this claim on the grounds that plaintiffs had presented no evidence, other than their own testimony, that they suffered physical manifestations of emotional distress. 420 N.W.2d at 625.

On appeal, the *Woyke* court affirmed the dismissal of plaintiffs' claims for emotional distress. The court noted that the Woykes testified that they no longer slept together, that Mrs. Woyke suffered from anxiety and hair loss, and that the Woyke children suffered from more colds than before the exposure. The court held that this testimony did not satisfy the requirement of medical evidence of physical manifestations of emotional distress. The court stated:

Here, medical evidence of injuries is "conspicuously absent from the record." Absent an objective showing of physical manifestations of emotional distress, a damage award for negligent infliction of emotional distress is not usually appropriate.

420 N.W.2d at 627, quoting *Hubbard,* 330 N.W.2d at 440.

Second, defendants note that plaintiffs have not alleged an underlying tort of the type required to support an award of damages for emotional distress. Third, defendants argue that no claim for intentional infliction lies because plaintiffs did not plead that cause of action in their complaint, and because plaintiffs' symptoms are not of the type that "no reasonable person could expect to endure." *Hubbard,* 330 N.W.2d at 440.

The Court believes that its prior rulings concerning the ability of TCE to cause harm, and the ability of plaintiffs to recover for increased risk of future harm, are dispositive of the emotional distress issue. The Court has already ruled that plaintiffs have created a factual issue as to whether TCE is capable of harming them.

If plaintiffs prove that they have suffered actual harm caused by the contaminants to which they have been exposed, then they will have satisfied the physical injury requirement, and may recover emotional distress damages. If plaintiffs prove that they have suffered a present physical injury that has caused them to have an increased risk of future harm, then they may recover emotional damages associated with that increased future risk.

While the Court rejects defendants' assertion that subcellular harm is not sufficient to support emotional distress damages, several courts have held that it is. *See Merry,* 684 F.Supp. at 852; *Anderson,* 628 F.Supp. at 1226–27. As previously stated, the human body is a complex organism, and this Court will not define what is and is not an injury. Additionally, plaintiffs have asserted other, clinical physical injuries allegedly caused by their exposure.

■ Plaintiffs may also proceed on the physical danger theory. Defendants argue that, as in *Woyke,* plaintiffs' alleged physical manifestations of emotional distress are merely subjective, and are insufficient to vouchsafe the authenticity of their distress claims. The physical manifestations of distress alleged by plaintiffs include: headaches, rashes, insomnia, gastrointestinal difficulties, loss of sleep, muscle pain, and diarrhea.

The Court is aware that many of these symptoms of distress are similar to those rejected in *Woyke* as inadequate. However, in *Woyke* the testimony came only from plaintiffs. No medical experts testified as to the validity and cause of the alleged physical symptoms. Here, plaintiffs have identified medical experts who will testify that plaintiffs' symptoms are authentic, and are caused by emotional distress. This is a crucial distinction, and is sufficient to send this theory to the jury.

Recovery for emotional damages based on an underlying tort is here less clear. Plaintiffs have alleged a cause of action for battery. If plaintiffs prove this claim, they will be entitled to prove emotional distress damages as well, at least in theory.[20] The Court will withhold ruling on this theory until such time as the parameters of plaintiffs' battery claim have been more fully developed at trial.

As to intentional infliction of emotional distress, the Court admits that it is skeptical as to plaintiffs' ability to recover under that theory. While it may be questionable that this tort was intended to apply in a situation such as this, nevertheless, it appears that there is a fact issue as to each of the four *Hubbard* elements in this case.[21]

---

**20.** The Court says "in theory" because defendants argue that any battery established would be based only on exposure to chemicals. Defendants assert that exposure alone is insufficient to sustain emotional distress damages.

**21.** The difficulty involved with proving a claim for intentional infliction of emotional distress is evidenced by the *Woyke* case. There, as here, plaintiffs attempted to prove intentional infliction based on involuntary exposure to TCE. The *Woyke* court upheld the trial court's grant of J.N.O.V. on that claim, and held that plain-

Therefore, the Court will not grant summary judgment as to that claim at this time.

### 4. Battery

Defendant Federal–Hoffman moves the Court to grant summary judgment as to plaintiffs' claims for battery arising out of Federal–Hoffman's disposal of toxic substances at the TCAAP site. Federal–Hoffman asserts that under Minnesota law, plaintiffs must prove that Federal–Hoffman disposed of the toxic material with the intent to cause an offensive or harmful contact with plaintiffs, or that Federal–Hoffman knew that such contact was substantially certain to occur. *Schumann v. McGinn*, 240 N.W.2d 525, 529–30 (Minn. 1976). Federal–Hoffman contends that plaintiffs have no evidence that it intended to cause a harmful or offensive contact, or that it knew such contact would occur.

■ Given that Federal–Hoffman disposed of highly toxic substances into sandy ground directly above a regional aquifer, the Court believes that there is sufficient evidence that Federal–Hoffman knew that its conduct was substantially certain to cause an offensive or harmful contact to preclude summary judgment.

### 5. Punitive Damages

Defendants Honeywell and Federal–Hoffman argue that plaintiffs have failed to put forward the clear and convincing evidence required to establish a *prima facie* for punitive damages under Minn.Stat. § 549.20, subd. 1 (1988). The federal defendant also argues that plaintiffs may not recover punitive damages under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* ("FTCA").

"Summary judgment is available in punitive damage cases. The standard for obtaining summary judgment, however, is an onerous one, and a summary judgment disposing of such claims will rarely be granted." Alsop and Herr, *Punitive Damages in Minnesota Products Liability Cases: A Judicial Perspective*, 11 Wm. Mitchell

L.Rev. 319, 326–27 (1985). This is particularly true where, as here, a case involves years of conduct by dozens of individuals resulting in substantial harm to the public interest. After a careful review of the record, the Court concludes that plaintiffs have presented sufficient evidence to avoid summary judgment in favor of Honeywell or Federal–Hoffman.

Plaintiffs concede that 28 U.S.C. § 2674 bars punitive damage awards under the FTCA. Plaintiffs' punitive damages claims against the USA will be dismissed. The federal defendant further notes that the only proper defendant under the FTCA is the United States. 28 U.S.C. § 2679(a). Accordingly, the Court will dismiss all claims under the FTCA against defendants other than the United States.

### 6. Increased Water Charges and Taxes

■ Defendants move the Court to grant summary judgment as to plaintiffs' claims for increased water charges and taxes. Plaintiffs who are residents of the City of New Brighton seek to recover these costs as response costs under CERCLA, 42 U.S.C. § 9607.

CERCLA does not allow for recovery of purely economic damages. *Artesian Water Co. v. New Castle County*, 851 F.2d 643, 649 (3rd Cir.1988). However, CERCLA does allow for recovery of the costs of obtaining alternative water supplies. 42 U.S.C. §§ 9607(a)(4)(B), 9601(23), (24).

Here, the City of New Brighton paid for and provided alternative water supplies for its residents. The City of New Brighton filed suit against the defendants in this case, as well as additional defendants, to recoup these costs. *City of New Brighton v. United States*, Civil No. 3–84–1110. The city settled this case, and was compensated for its expenditures by defendant United States.

New Brighton plaintiffs have submitted the affidavit of an expert economist who opines that they paid higher water bills and

---

tiffs had failed to prove *any* of the four elements required by *Hubbard* required to sustain a claim

for intentional infliction of emotional distress.

taxes because the city was forced to provide an alternative water supply. Porter aff. at 4. New Brighton plaintiffs therefore conclude that they are entitled to recover these increased utility charges and taxes as response costs for provision of alternative water supplies.

It is clear that only the City of New Brighton actually provided alternative water supplies. It is equally clear that the City of New Brighton has recovered these costs through settlement. A city is a political and legal entity which is necessarily made up of its citizens. When a city pays for something, it is always the citizens who ultimately pay. However, in the eyes of the law, the city is the relevant actor.[22]

Here, the city has already recovered the monies plaintiffs seek. Since they are the city, it is up to them how to distribute the reimbursement. Plaintiffs must look to the political process within their municipality to appropriately distribute the settlement proceeds. Plaintiffs increased water charges and taxes are not recoverable as response costs under Section 9607.

### 7. Attorneys' Fees

Defendants urge the Court to rule that plaintiffs may not recover attorneys' fees as a response cost under Section 9607. Generally, the Court will not address attorney fees issues until an application for such fees, made by a prevailing plaintiff, is before the Court. The Court sees no reason in this case to deviate from this policy.[23]

### 8. Causation at Trio Solvents

Defendants Bendel and Erickson move the Court for summary judgment as to plaintiffs' common law claims for personal injuries, property damage and economic losses. Defendants argue that plaintiffs have failed to provide any evidence that contaminants from the Trio Solvents site could have caused plaintiffs' injuries.

Defendants admit that there is evidence that chemicals from the Trio Solvents site have escaped into the unit 1 aquifer below Butcher's spur. Defendants maintain, though, that unit 2, which consists of clay, silt, and sand, forms an impregnable barrier that prevents contaminated water from migrating into the unit 3 and 4 regional aquifers from which plaintiffs draw there drinking water. Bendel and Erickson contend that plaintiffs have offered no evidence to show that they could have ingested chemicals originating from the Trio Solvents site.

The Court has previously heard and denied a summary judgment motion on this issue. While plaintiffs' evidence on this point is not overwhelming there is a triable issue of fact as to whether plaintiffs' alleged injuries could have been caused by contaminants from the unit 1 aquifer under the Trio Solvents site.

### 9. Damage to Natural Resource

Plaintiff City of St. Anthony asserts that it can recover for natural resource damages under 42 U.S.C. § 9607(a)(4)(C). Plaintiff seeks to recover for damage to the Prairie-du-Chien aquifer from which St. Anthony obtains its municipal water supply. "Natural resources" are defined to include "water, ground water, drinking water supplies and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States ... any state or local government, or any foreign government. 42 U.S.C. § 9601(16). Section 9607(f)(1) states that liability for natural resource

---

**22.** This is true in many situations. If city hall burns to the ground, any insurance proceeds will go to the city as a legal entity. This is true even if the city has increased taxes on its residents to pay for a new city hall.

Similarly, if the city pollutes a neighboring towns water supply in violation of CERCLA, the city is liable. The converse of plaintiffs' theory is that they would be individually liable for CERCLA response costs owed by their municipality.

**23.** At the oral hearing on these motions, the Court asked counsel for the federal defendant why the Court should rule on an attorney fees issue at this stage of the case. Counsel replied that a ruling on this issue would aid the parties in terms of settlement. If the federal defendant showed any genuine interest whatsoever in settlement, the Court might accommodate the parties and rule on this issue. It has not, so the Court will not rule at this time.

damage shall be "to the United States Government and to any State for natural resources within the State...."

Defendants Bendel and Erickson argue that under the language of CERCLA, only a state can sue for damage to natural resources. Plaintiffs argue that the word "State" in section 9607(f)(1) should be read expansively to include local governments. Plaintiffs point out that the CERCLA definition of "natural resource" includes resources "appertaining to" or "otherwise controlled by" a local government. Plaintiffs conclude that this reference to local governments in the definition of natural resources justifies a broad reading of the liability section.

█ This is a close and difficult question. The only cases directly on point support plaintiffs' view. In both *City of New York v. Exxon Corp.*, 633 F.Supp. 609, 618–19 (S.D.N.Y.1986) and *Town of Boonton v. Drew Chemical Corp.*, 621 F.Supp. 663, 666 (D.N.J.1985), the courts held that a city could recover for natural resource damage under section 9607(a)(4)(C). The *Exxon* court rejected the argument that section 9607(f)(1) limited standing to sue to the state. 633 F.Supp. at 619. The court stated:

> Since the statute specifically includes within its ambit "natural resources" which are under the control of local governments, the acts broad remedial intention is not furthered by a reading which requires the State, which is not the government charged with managing and conserving those resources, to bring suit for damages done to them.

*Id.* (Footnote omitted)

> Likewise, the Court in *Drew* reasoned: It would be anomalous for this far reaching remedial statute to give states a cause of action for damages to natural resources owned by the State but for it to exclude cities from access to such a cause of action while expressly including resources owned by "local governments" within the scope of the protected subject of § 9607(a)(4)(C).

621 F.Supp. at 666.

Defendants rely on the reasoning applied by the court in *Lutz*. In that case, the court rejected an attempt by private parties to recover for damage to a natural resource under CERCLA. The court ruled that only the United States or the State of Pennsylvania had standing to seek such damages under CERCLA. 718 F.Supp. at 419. The *Lutz* court based this holding on the language of section 9607(f), and also on the fact that under Pennsylvania law, protection and control of the waters of the commonwealth is specifically assigned to the state. *Id.*

*Lutz* is not directly on point because it involved an attempt by private parties to recover natural resource damages, and not a municipality. Still, defendants urge that the basic reasoning of the *Lutz* court is sound. Defendants contend that where state law itself gives control over water to the state, only the state can recover natural resource damages pursuant to CERCLA. Defendants point out that in Minnesota, the state is designated as trustee of all "waters of the state." Minn.Stat. §§ 115.-01, subd. 9, 115B.17, subd. 7. Any action for natural resource damages under MERLA, the state counterpart of CERCLA, must be brought by the attorney general. Minn.Stat. § 115B.17, subd. 7.

Defendants also cite *City of Philadelphia v. Stepan Chemical Co.*, 713 F.Supp. 1484 (E.D.Pa.1989). In *Stepan*, the court ruled that the city of Philadelphia was not a "state" within the meaning of section 9607(a)(4)(A). *Id.* at 1496. The court relied on the CERCLA definition of "United States," 42 U.S.C. § 9601(27), which does not include municipalities. *Id.* at 1487. The court rejected the broad scope given to the term "state" by the *Drew* court. *Id.* at 1488–90.

*Stepan* is not directly on point because it deals with response costs under section 9607(a)(4)(A) and not with natural resource damages under section 9607(a)(4)(C). Defendants, though, note the overall similarities between these two provisions, and argue that *Stepan* stands for the general proposition that the term "state" as used in CERCLA does not include municipalities.

In this case, the Court believes that the plain language of section 9607(f)(1) controls. That section states that liability "shall be to the United States Government and to any State for natural resources within the State...." By its terms, the statute permits recovery only by the state.

The Court acknowledges that other courts have broadened this language to encompass municipalities. However, both the courts in *Exxon* and *Drew* relied on the fact that the municipality involved either owned or controlled the natural resource at issue. 633 F.Supp. at 619; 621 F.Supp. at 667. The court in *Exxon* stated that the entity that was "entrusted" with management of the resource should be able to sue to protect it. 633 F.Supp. at 619.

In this case, Minnesota law dictates that the waters of Minnesota are held in trust by the state. Minn.Stat. § 115B.17, subd. 7. In Minnesota, the Attorney General has sole authority to recover damages to natural resources under state environmental laws. *Id.* This shows that in Minnesota, the entity charged with protection of waters is the state.

St. Anthony does not claim that it is responsible for managing or otherwise controlling the aquifer. Rather, the City states that the aquifer is appurtenant to the City.

The Court believes that the language of section 9607(f)(1), combined with Minnesota law, preclude recovery by plaintiff St. Anthony for damages to the Prairie-du-Chien aquifer.

## 10. MERLA

The non-federal defendants concede that plaintiffs have pled a valid cause of action for response costs under MERLA section 115B.04. The non-federal defendants move the Court for summary judgment as to plaintiffs' claims for economic loss and personal injury under MERLA section 115B.05.[24] Defendants assert that MERLA section 115B.06 applies to this case, and

effectively bars any claims under section 115B.05. MERLA section 115B.06 states:

Section 115B.05 does not apply to any claim for damages arising out of the release of a hazardous substance which was placed or came to be located in or on the facility wholly before July 1, 1983.

Minn.Stat. § 115B.06.

Defendants maintain that all of the hazardous substances involved in this case were placed at TCAAP and Trio Solvents wholly before July 1, 1983.

Plaintiffs reply that section 115B.06 does not apply to this case because it was enacted as an amendment in 1985, after commencement of plaintiffs' suit. The amendment does not state that it applies retroactively. Minnesota laws do not apply retroactively unless "clearly and manifestly so intended by the legislature." Minn.Stat. § 645.21. Regarding statutory amendments, Minn.Stat. § 645.31 states:

When a section or part of a law is amended ... the new provisions shall be construed as effective only from the date when the amendment became effective.

Defendants assert that the amendment shows a clear and manifest legislative intent that it apply retroactively. Defendants point out that the amendment is entitled "Application to past actions." Defendants argue that an amendment enacted in 1985 which cuts of liability for actions taken before 1983 must by its very nature be retroactive.

■ The Court agrees. The intent of the legislature in amending section 115B.06 was clearly to cut off liability for past actions. The statute is inherently retroactive. The legislature made the amendment effective immediately. The Court believes that section 115B.06, as amended, applies to this case.

Plaintiffs argue that even if the amendment is applicable, defendants do not qualify for its protection because they are currently releasing toxic chemicals into the air, a portion of which land in or on the

---

**24.** The United States has moved the Court to dismiss all of plaintiffs' MERLA claims for lack of subject matter jurisdiction. This motion is unnecessary. The Court has already dismissed plaintiffs' MERLA claim as against the United States in its Order dated February 8, 1990.

TCAAP facility. In plaintiffs' view, the hazardous substances at TCAAP have not come to be located in or on the facility wholly before July 1, 1983.

Plaintiffs have not provided the Court with details concerning the alleged air pollution at TCAAP. It appears to the Court that these chemicals are being released into the air as part of the ongoing cleanup at TCAAP. In other words, these are substances which were placed at TCAAP prior to 1983 that are being thrown into the air during the cleanup, only to resettle at TCAAP. The Court has no evidence that such substances have been placed at TCAAP after 1983.

### 11. Nuisance and Trespass

At a previous hearing held on January 19, 1990, the Court dismissed all of plaintiffs' claims against the United States sounding in strict liability. *See Laird v. Nelms,* 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1972). As part of that motion, the United States had moved to dismiss plaintiffs' claims for nuisance and trespass on the grounds that they too sounded in strict liability. Needing further elaboration of this argument, the Court took the motion under advisement as to those counts.

Further briefing shows that the United States fears stem from the fact that under Minnesota law, a nuisance action may be based on intentional conduct, negligent conduct, or ultrahazardous conduct. *Highview North Apartments v. County of Ramsey,* 323 N.W.2d 65, 71 (Minn.1982). If nuisance is based on ultrahazardous conduct, strict liability may apply. *See* W. Prosser, *Law of Torts,* 387 (4th Ed.1971).

Here, all parties agree that the United States may not be held strictly liable as a matter of law. Consequently, it is not necessary for the Court to dismiss plaintiffs' nuisance or trespass claims. The Court holds that plaintiffs may not recover against the United States under any theory of nuisance or trespass that holds the United States strictly liable. Plaintiffs will have to prove negligent or intentional conduct, depending on the elements of the particular tort under Minnesota law.

### 12. Grudnoske and Winiecki Families

Defendants argue that the common law claims asserted by members of the Grudnoske and Winiecki families must be dismissed because they cannot prove exposure to TCE or any other harmful substance. Defendants' contention stems from the fact that these families obtain their water from private wells. Tests on those wells by the MPCA failed to detect any of the chemicals at issue in this case.

Plaintiffs respond that they have been exposed to TCE emitted into the air by several of the cleanup mechanisms being employed at TCAAP. Leonard Grudnoske also states that he used New Brighton municipal water form 1961 through 1963.

Defendants respond that plaintiffs cannot rely on airborne TCE exposure because they have not previously asserted such claims. Additionally, defendant United States asserts that FTCA claims based on TCAAP cleanup procedures are barred by the discretionary function exception to the FTCA.

The Court has neither sufficient evidence nor briefing to make a reasoned decision on this issue. Defendants apparently have not had an opportunity to inquire into the alleged airborne exposure. Nor have plaintiffs or the United States actually briefed the discretionary function issue as it relates to the Grudnoskes and Winieckis.

Rather than precipitously deny the claims of these plaintiffs, the Court will hold defendants' motion in abeyance. If and when these claims are set on for trial, the Court will address these issues with the aid of additional argument form counsel.

### 13. Court's Order of May 3, 1989

Defendants Bendel and Erickson state that the Court's Order of May 3, 1989 dismissing certain claims against upgradient plaintiffs inadvertently omitted some plaintiffs who should have been included in the Order. Plaintiffs agree. Accordingly, the Court's Order of May 3, 1989 shall be amended *nunc pro tunc* so that para-

graphs 1 and 3 include the following plaintiffs: David Yepma, Betty Yepma, Jack Lee, Duane Lee and Brett Nordquist.

### III. Class Certification

The Court has not yet ruled on plaintiffs' renewed motion for class certification. Plaintiffs seek to certify two distinct classes pursuant to Rule 23(b)(3), Fed.R. Civ.P. First, plaintiffs seek to certify a class to recover damages for increased water charges and taxes. Second, plaintiffs seek to certify a class of people entitled to receive reimbursement for medical monitoring expenses.[25]

This class certification motion is unusual because it is before the Court at a late stage of the litigation. Normally, when ruling on a class certification motion, all jurisdictional allegations are taken as true. *Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976). In this case plaintiffs motion is before the Court at the same time as defendants' summary judgment motions. The Court's summary judgment rulings preclude certification of either class proposed by plaintiffs.

First, the Court has already held that plaintiffs may not recover for increased water charges or taxes. *See* Part II–6, *supra*. This obviously removes the need for a class action.

■ Second, the Court has ruled that plaintiffs may not seek medical monitoring damages under CERCLA, or recover medical monitoring costs as injunctive relief under RCRA. The only remaining basis for medical monitoring costs is the common law.

The Court would have to certify a pendent class action. The Court does have the power to do this. *Almenares v. Wyman*, 453 F.2d 1075 (2d Cir.), *cert. denied* 405 U.S. 944, 92 S.Ct. 962, 30 L.Ed.2d 815

(1972). However, this option should be utilized only in exceptional cases. *Id.* at 1085–86. The Court in *Almenares* noted that certification of a pendent class "could well be an abuse of discretion," especially where "the factual issues surrounding [a plaintiff's claim] are complex." *Id.* at 1086.

Here, each individual plaintiff's claim is complex. To recover medical monitoring damages, a plaintiff will have to prove that he or she is at an increased risk of future harm. *See* Part II–2, *supra*. Such proof is not workable in a class action format. The Court does not believe that this is a proper case for certification of a pendent class action.

Plaintiffs further argue that the Court can certify a medical monitoring class against the United States under the FTCA.[26] In order to maintain a class action under the FTCA, plaintiffs must show that:

(1) each of the claimants have individually satisfied all of the jurisdictional requirements; or

(2) a class claim has been filed which names the individual claimants, asserts and establishes the authority of the named claimants to present claims on behalf of the unnamed class members, states the total amount of the claim for the entire class and otherwise satisfies the jurisdictional requirements.

*Lunsford v. U.S.*, 570 F.2d 221, 227 (8th Cir.1977).

Plaintiffs satisfy neither test. First, all proposed class members have not filed administrative claims as required by 28 U.S.C. § 2675(a). Each claimant has not individually satisfied the FTCA jurisdictional requirement.

Second, Plaintiffs have not asserted any authority to represent the proposed class

---

**25.** Plaintiffs define this class as:
 Named individual plaintiffs and all residents of the City of New Brighton between the years 1957 and 1982 who lived at least one year in the City and used municipal water. This class is certified for a determination of liability and damages against all defendants for the cost of medical monitoring of class members because

they have incurred some increased risk of disease due to the contamination of municipal water.

**26.** The FTCA may not be used to establish pendent-party jurisdiction. *Finley v. United States*, —— U.S. ——, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989).

members. In denying plaintiffs motion to certify a class in *Lunsford,* the court stated:

> The administrative claims filed here did not adequately present the claims of the unnamed class members. Not all of the claimants were identifiable; none of the named plaintiffs asserted authority to present claims on behalf of the unnamed class members; and no sum certain was stated with respect to the class claim so that the government could evaluate the claim for possible settlement.

570 F.2d at 225. All of these problems exist in this case as well. Plaintiffs are not entitled to use the FTCA to support a class action. Plaintiffs renewed motion for class certification will be denied as to both proposed classes.

▮▮▮ The Court also has not yet ruled on plaintiffs' original motion to certify an injunctive relief class under Rule 23(b)(2). Since the Court has not dismissed all of plaintiffs' claims for injunctive relief, the Court sees no reason to deny class certification as to claims for injunctive relief. Rule 23(c)(4)(A) states:

> When appropriate, an action may be brought or maintained as a class action with regard to particular issues.

Here, it makes good sense to certify a class as to the injunctive relief issues. It would be pointless to have individual plaintiffs seeking injunctive relief. Rule 23(b)(2) was designed for exactly this type of situation.

To summarize, plaintiffs' remaining claims for injunctive relief are:

(1) claims at TCAAP. If plaintiffs can demonstrate that a distinct phase of the cleanup at TCAAP is complete, then they can challenge the adequacy of that phase under 42 U.S.C. §§ 9613(h)(4), 9659. *See* Part I–1, *supra.*

(2) claims at Trio Solvents. Plaintiffs still have injunctive relief claims at the Trio Solvents site under MERA, CWA and RCRA. *See* Part I–3 and Part I–4, *supra.*

The definition of the class will be all persons who could potentially be harmed by a completed remedial phase which does not comply with CERCLA, and all persons who could potentially be harmed by ongoing violations of MERA, CWA or RCRA, as the case may be. The Court will consider further dividing this class into two subclasses pursuant to Rule 23(c)(4)(B) if necessary for an expeditious trial.

### IV. *Pre-Trial Matters*

Also pending before the Court is a motion by plaintiffs' for reconsideration of the Court's Order of November 30, 1989, and plaintiffs' appeal from the Special Master's Order of November 24, 1989. Essentially, both Orders preclude plaintiffs from amending their interrogatory answers to assert new personal injury claims for alleged neurological and neuropsychological damage. The Special Master denied plaintiffs' motion to add these new claims because it was untimely.

Plaintiffs now argue that the Court should reconsider its previous Order affirming the Special Master, and grant their current appeal.

The Court has considered this issue long and hard. After weighing all of the relevant factors, the Court must conclude that its initial position is still correct. This is a case that literally could last another decade. Deadlines are essential if such a case is to be resolved. The Court also believes that adding new claims at this state would cause unacceptable delay.[27]

It is the Court's intention to try this matter starting in February, 1991. The first trial will address personal injury claims. The first trial will involve one of the following three families, or some subset or combination thereof: the Werleins, the Yepmas, the Fabians.

The Court is interested in the parties' views as to what grouping would be most profitable for a first trial, *i.e.,* one whole family, one member from each family, etc.

---

**27.** Unacceptable, that is, to the Court. The Court does not credit defendants' new-found antipathy towards delay.

The Court also notes that in the event the Court denies plaintiffs' motions, plaintiffs have requested an immediate appeal pursuant to 28 U.S.C. § 1292(b). This request is denied.

The Court directs the parties to contact the Special Master for further direction in this regard.

Accordingly, IT IS HEREBY ORDERED that:

1. TCAAP defendants' motion to dismiss plaintiffs' claims for injunctive relief is granted to the extent those claims seek to challenge the ongoing cleanup at TCAAP. All such claims are dismissed without prejudice for want of subject matter jurisdiction.

2. Defendants' motion for summary judgment as to plaintiffs' claims for medical monitoring as injunctive relief under RCRA is granted.

3. Defendants Erickson and Bendel's motion for summary judgment as to plaintiffs' claims under 42 U.S.C. § 6972(a)(1)(A) for an ongoing violation of RCRA is granted.

4. Defendants Erickson and Bendel's motion for summary judgment as to plaintiffs' claims under 33 U.S.C. § 1365(a) for violation of CWA and under Minn.Stat. § 116B.01 for violation of MERA is denied.

5. Defendants motion for summary judgment as to plaintiffs' common law claims for increased risk of future harm, emotional distress, and medical monitoring is denied.

6. Defendant FHI's motion for summary judgment as to plaintiffs' claims for battery is denied.

7. Defendant FHI and Honeywell's motion for summary judgment as to plaintiffs' claims for punitive damages is denied. Defendant the United States' motion for summary judgment as to plaintiffs' claims for punitive damages is granted. All claims under the FTCA, 28 U.S.C. § 2679(a), against defendants other than the United States are dismissed.

8. Defendants' motion for summary judgment as to plaintiffs' claims for increased water charges and taxes as response costs under CERCLA, 42 U.S.C. § 9607, is granted.

9. Defendants' motion for summary judgment as to plaintiffs' claims for attorneys' fees as response costs under CERC-LA, 42 U.S.C. § 9607, is denied because it is not ripe for decision.

10. Defendants Erickson and Bendel's motion for summary judgment as to plaintiffs' common law claims is denied.

11. Defendants Erickson and Bendel's motion for summary judgment as to plaintiff City of St. Anthony's claims for natural resource damages under CERCLA, 42 U.S.C. § 9607(a)(4)(C), is granted.

12. Defendants' motion for summary judgment as to plaintiffs' claims under MERLA, Minn.Stat. § 115B.04, is granted.

13. Defendant the United States' motion for summary judgment as to plaintiffs' claims for nuisance and trespass is granted to the extent those claims rely on a theory of strict liability, and denied in all other respects.

14. Defendants' motion for summary judgment as to claims by plaintiffs who are members of the Grudnoske and Winiecki families is denied.

15. The Court's Order of May 3, 1989 is amended *nunc pro tunc* so that paragraphs 1 and 3 include the following plaintiffs: David Yepma, Betty Yepma, Jack Lee, Duane Lee and Brett Nordquist.

16. Plaintiffs' renewed motion for class certification pursuant to Fed.R.Civ.P. 23(b)(3) is denied. Plaintiffs' motion for certification of an injunctive relief class pursuant to Rule 23(b)(2) is granted under the terms outlined in Part III of the memorandum.

17. Plaintiffs' motion for reconsideration of the Court's Order of November 30, 1989 is denied. Plaintiffs' appeal from the Special Master's Order of November 24, 1989 is denied. Plaintiffs' request for an interlocutory appeal from this decision is denied. The parties are hereby directed to contact the Special Master for the purposes outlined in Part IV of the memorandum.